**IN THE UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF ARKANSAS**
**WESTERN DIVISION**

**DORIS R. SMITH**                                           **PLAINTIFF**

**VS.**                     **CASE NO. 4:17-CV-857-JM**

**DEPARTMENT OF FINANCE**
**and ADMINISTRATION**                                  **DEFENDANT**

## BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

### INTRODUCTION

Doris Smith has filed an employment discrimination lawsuit against the Department of Finance and Administration ("DFA") alleging that that she did not receive a second promotion because of her race. (Doc. No. 17). Smith alleged violations under Title VII of the Civil Rights Act of 1964 (42 U.S.C. § 2000 *et. seq*.) and 42 U.S.C. § 1983. For the reasons explained below and in the Affidavits, summary judgment should be granted in favor of DFA.

### STANDARD OF REVIEW

Summary judgment is appropriate when there is no genuine issue as to a material fact, and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The Court views all evidence in the light most favorable to the nonmoving party. *Harlston v. McDonnell Douglas Corp.*, 37 F.3d 379, 382 (8th Cir. 1994). While we view the facts in a light most favorable to the non-moving party, mere allegations which are not supported with specific facts are not enough to withstand the motion. *Harris v. Forklist Systems, Inc.,* 510 U.S. 17 (1993). Motions for summary judgment essentially "define disputed facts and issues and …dispose

of unmeritorious claims [or defenses]. *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2008). One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses. *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986).

A fact is *material* when it "might affect the outcome of the suit under the governing law. *Johnson v. Crooks*, 326 F.3d 995 (8th Cir. 2003) quoting *Anderson v. Liberty Lobby, Inc.* 477 U.S. 242, 248 (1986). When the sufficiency of the complaint has been challenged, however, the plaintiff then bears the burden of showing that there is a genuine issue of material fact left for trial and must fulfill that burden by providing specific facts beyond those produced in the pleadings. *Pourmehdi v. Northwest Nat'l Bank*, 849 F.2d 1145, 1146 (8th Cir. 1988).

In *Celotex,* the Supreme Court stated regarding summary judgment:

> The Federal Rules of Civil Procedure have for almost 50 years authorized motions for summary judgment upon proper showings of the lack of a genuine, triable issue of material fact. Summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed "to secure the just, speedy and inexpensive determination of every action."
>
> ********
>
> Rule 56 must be construed with due regard not only for the rights of persons asserting clams and defenses that are adequately based in fact to have those claims and defenses tried to a jury, but also for the rights of persons opposing such claims and defenses to demonstrate in the manner provided by the Rule, prior to trial, that the claims and defenses have no factual basis.

*Id.* 477 U.S. at 327.

## FACTUAL BACKGROUND

Doris Smith has filed this action because she was denied a second promotion after receiving a first promotion in the amount of $6,022. DFA 10 employees received a promotion but all of them did not receive a second promotion. Smith was treated no differently than the nine other employees who did not receive a second promotion.

On February 7, 2017, Doris Smith, an African-American, was the Department of Finance and Administration ("DFA") Administrator of the Office of Intergovernmental Services and State Technology Administrator ("IGS") (SUMF ¶ 2). (SUMF ¶ 2). As IGS Administrator, Smith made applications for federal grants, managed the grant awards and received federal warrants. Her office was the pass through for the grant funds. (SUMF ¶ 3)

Smith's office also operated the State clearinghouse and served as the public notice of venue for state and local agencies. (SUMF ¶ 4). Smith's office managed the statewide records retention policy. This included her contemplating destroying of deleted records. (SUMF ¶ 5). In addition Smith's office managed the State's Information Technology cost analysis project, provided planning and support to all state agencies for submission of their plans to purchase any information technology that exceeded $100,000. (SUMF ¶ 6)

In February 2017, Smith's salary pay grade was N909 which corresponded to a salary of $102,088. (SUMF ¶ 7). On February 7, 2017, Senate Bill 289 was introduced in the Arkansas General Assembly to revise the Compensation Plan

under the Uniform Classification and Compensation Act. (SUMF ¶8). SB289 authorized compensation for DFA employees, including Smith and Ricky Quattlebaum. The original bill authorized Smith and Quattlebaum a salary increase at a pay grade of GS-15. (*Id.*). Smith did not know what a GS-15 pay grade salary amount would be. (SUMF ¶ 4). Smith was never actually a GS-15, it was only proposed legistation by the General Assembly.

On February 21, 2017, SB289 was amended to authorize compensation for employees at a pay grade from N909, N906 or N907 to SE02. (SUMF ¶ 9). The General Assembly approved the authorization of compensation, contrarily the DFA did not authorized it. (*Id.*)

. On March 6, 2017, Governor Hutchison signed the General Assembly's SB289 as Act 365. The General Assembly made the decision to authorize the pay grade but the Act was not a binding re-classification of employees from the N909 or N906 pay grade to the SE01 or SE02 pay grade. (SUMF ¶11). In passing Act 365 of 2017, the General Assembly did not guarantee that Smith would be re-classified at a SE02 pay grade, it only <u>authorized</u> a SE02 pay grade. (SUMF ¶ 12). DFA did not contract with Smith to be classified as a SE02 pay grade because her pay grade was subject to the discretion and classification of the Office of Personnel Management ("OPM"). (SUMF ¶ 13)

For the purposes of implementing the uniform employee classification and compensation plan for the respective agencies, the General Assembly determined that the class specifications prepared by the OPM in classifying the various

positions, shall be the class specification to be implemented and decided by the respective appropriations by the OPM. (SUMF ¶ 14)

The process for implementing and deciding the re-classification of the employees was made by a committee consisting of Barnhill, Administrator of Office of Personnel Management; ("OPM"); Carla Hagan, DFA Deputy Director Chief of Staff; and Larry Walther, DFA Director. (SUMF ¶ 15)

There were 16 employees who were re-classified from the pay grade of N909, N906, or N907. These employees were: Ricky Quattlebaum (N907), John Shelnutt (Ex. "K", *Job Description*), Melanie Hazeslip (N906) (Ex."L"), Vicki Mills (N906) (Ex. "M"), Edward Armstrong, Duncan Baird, Joel DiPippa (Ex. "N"), Lynne Reynolds (Ex. "O"), Tonie Shields, Chris Howlett, Deanna Munds-Smith (Ex. "P"), Wayne Hamric (Ex. "Q"), Amanda Endsley (Ex. "R"), Doris Smith, Kenneth Williams, and Kay Barnhill. (SUMF ¶ 16)

The committee met, pursuant to Ark. Code Ann. § 21-5-210, and evaluated each of the employees in light of authorized pay grades and re-classified each of the following employees based upon the following (the "factors"): breadth and depth of the job responsibilities, number of employees supervised, financial responsibilities of each employee, and input in State policy. (*Id.*)

Based upon these factors John Shelnutt, Melanie Hazeslip, Vicki Mills, Joel DiPippa, Lynne Reynolds, Tonie Shields, Deanna Munds-Smith, Wayne Hamric, Amanda Endsley, and Doris Smith were re-classified and promoted to the SE01 pay

grade.  (*SUMF ¶ 18).*  Smith was not the only employee re-classified to SE01, rather 9 other DFA employees were re-classified to SE01.  (SUMF ¶ 18)

Smith was promoted from a pay grade of N909 to a SE01, with a raise of annual salary of $6,022 (from $102,088 to $108,100).  (SUMF ¶ 20).  Based on the factors, Ricky Quattlebaum, Edward Armstrong, Duncan Baird, Kay Barnhill, Chris Howlett, and Kenneth Williams were re-classified and promoted to the SE02 pay grade. (SUMF ¶ 21).  Other employees, including Smith, were re-classified to SE01, based on the factors.  (SUMF ¶ 22)

On March 21, 2017, Smith filed her first EEOC Charge of Discrimination based on her race, alleging that she found out that she was the only employee not re-classified.  (SUMF ¶ 24).

On October 31, 2017, Smith filed a second EEOC Charge of Discrimination because she believed that she was demoted with a reduction in pay and continued to be treated differently with respect to harassment and intimidation in retaliation for filing a previous charge of discrimination because of her race.  (SUMF ¶ 25)

Smith was ultimately responsible for filing the implementation plan ("plan") for the Office of Violence to Women ("OVW") which awarded the STOP grant. Smith was responsible was for the overall office.  (SUMF ¶ 26).  Autumn and Bousquet were not ultimately responsible for the plans.  (SUMF ¶ 27)

In 2017-2018, the Office of Intergovernmental Services ("IGS") submitted three plans to the OVW.  (SUMF ¶ 28).  Smith had the responsibility of ensuring that the staff was performing their duties as assigned.  (SUMF ¶ 29).  Smith did not

review the first plan before it was submitted on June 28, 2017. (SUMF ¶ 30). Smith didn't review every plan that Bousquet submitted. (SUMF ¶ 31). Smith had no knowledge that the plan was submitted without proper documentation. (SUMF ¶ 35). The first plan was submitted without the documents that were required by the Office of Violence Against Women ("OVW"). (SUMF ¶ 34). Smith and the employees of IGS had weekly staff meetings together but Smith did not review the documents. (SUMF ¶ 37)

On the date the first implantation plan was submitted, Smith was on vacation in Italy. (SUMF ¶ 33)

The first STOP plan was submitted on June 28, 2017 and was not approved by OVW. (SUMF ¶ 36)

For the second plan, Smith reviewed the documents for the second plan as they made revisions to the plan and ensured that they had all the required elements into the plan. (SUMF ¶ 38). However, Smith did not see or use the template that was provided by the OVW. (SUMF ¶ 39)

Smith was more involved in the second plan because she said that she was ultimately responsible for the plans. (Ex. "A", 66:9-11). Smith knew about the OVW website, that could help put together the plan. (SUMF ¶ 41). Unlike the first plan, Smith directly oversaw the second plan. The technical team assured that they had meetings with the Advisory Board and received the documents, reviewed the documents that had been pulled together and gathered communications. (SUMF ¶ 42)

There was a second plan submitted in November 2017. (SUMF ¶ 43). The second plan was not approved by OVW. (*Id.*)

Since the first and second plan were rejected twice, the funds could not pass through the STOP grant funds to the recipient agencies. The agencies needed money to function so we borrowed money from the State rainy day fund. (SUMF ¶ 44 The lack of the funds from the unapproved first and second plan, affected the agencies services that rely on the grant money for shelters, such as agencies for the homeless. (*Id.*)

On February 16, 2019, Paul Louthian assigned Hemphill, Melanie Hazeslip, and Stacy Crawford to work on the third plan. (SUMF ¶ 45). Doris was removed from the STOP grant project. (*Id.*)

On April 3, 2018, DFA terminated Smith's employment. The basis of the termination was that she failed to carry out her job duties, acted insubordinately, and directed employees under her supervision. She failed to provide the required documentation to OVW and this was one reason that OVW did not approve grant money to Arkansas. (SUMF ¶ 46)

OVW's failure to approve the grant money to Arkansas under the STOP Program. (*Id.*). Smith failed to provide proper documentation to the OVW. (*Id.*). Her failure to be forthcoming with the Director which threatened the integrity of the grant program. (*Id.*). Smith acted insubordinately towards the Director and her supervisor and instructed employees under her supervision to disregard his insurrections. (*Id.*)

On April 6, 2018, IGS submitted the third plan to OVW. (SUMF ¶ 51). On April 23, 2019, the third STOP grant was approved by OVW. (SUMF ¶ 52)

On July 24, 2018, Smith filed the third EEOC Charge of Discrimination on the basis that she allegedly was discharged on April 3, 2018 on account of her race and in retaliation for filing prior charges of discrimination. (SUMF ¶ 53)

Smith has named no DFA employees as comparators for the termination issue. (SUMF ¶ 54)

Hemphill is a non-white and is direct subordinate to Smith. (SUMF ¶ 55). Debbie Bousquet is an African-American and is a subordinate to Hemphill. (SUMF ¶ 56). Kenya Huffington is an African American. (SUMF ¶ 57). Pamela Bradley is an African-American. (SUMF ¶ 58). James Lawson is an African American. (SUMF ¶ 32), and Marilyn Graham is an African-American. (SUMF ¶ 61)

## ARGUMENT

### I. DFA is entitled to sovereign immunity from Smith's Complaint.

DFA is immune from this lawsuit based on Eleventh Amendment sovereign immunity. The Eleventh Amendment states: "The Judicial power of the United States shall not be construed to extend to any suit in law in equity, commenced or prosecuted against one of the United States by citizens of another State, or Citizens or subjects of any foreign State." U.S. Const. amend. XI; *Seminole Tribe of Florida vs. Florida,* 517 U.S. 44 (1996). The Eleventh Amendment has two presuppositions: first, that each state is sovereign and, second, that "it is inherent in the nature of the sovereign not to be amenable to suit of an individual without its consent." *Hans v. Louisiana*, 134 U.S. 1 (1890); *Puerto Rico Aqueduct and Sewer Authority*, 506

U.S. 139 (1993) (The Amendment is rooted in a recognition that the States, although a union, maintain certain attributes of sovereignty, including sovereign immunity).

The United States Supreme Court's decisions establish that "an unconsenting State is immune from suits brought in federal courts by her own citizens as well as by citizens…." *Employees v. Missouri Public Health & Welfare Dep't*, 411 U.S. 279, 294 (1973). In absence of consent, a suit in which the State or one of its agencies or departments is named as a defendant is immune from suit. *Pennhurst State School & Welfare Dep't v. Halderman*, 465 U.S. 89, 100 (1984). This jurisdictional bar applies regardless of the nature of the relief sought. *Missouri v. Fiske*, 290 US. 18, 27 (1933).

Smith has sued DFA, which is a state agency. *See* Ark. Code Ann. § 25-13-101, *et seq*. This lawsuit is barred by Eleventh Amendment sovereign immunity "regardless of the nature" of the relief sought. Consequently, DFA is entitled to summary judgment as a matter of law.

## II. Smith cannot prove that the alleged discrimination with direct evidence.

Title VII protects employees from discrimination on the basis of race, color, religion, and sex. 42 USC § 2000e-2(a)–(c). "The ultimate question in every employment discrimination case involving a claim of disparate treatment is whether the plaintiff was the victim of intentional discrimination." *Reeves v. Sanderson Plumbing Products, Inc.,* 530 U.S. 133, 153 (2000). This can be established through either direct evidence of discrimination or through indirect

evidence, employing the *McDonnell Douglas* analytical framework.

A plaintiff in a discrimination case may survive a defendant's motion for summary judgment in one of two ways: through direct proof of discrimination or, in the absence of direct proof, evidence by "creating the requisite inference of unlawful discrimination through the *McDonnell Douglas* analysis, including sufficient evidence of pretext that the employer's stated reason for its action was a pretext for prohibited discrimination." *Griffith v. City of Des Moines*, 387 F.3d 733 (8th Cir. 2004).

The same proof standards and analytical framework apply to Plaintiffs' claims under 42 U.S.C. Sections and 1983. *See, Briggs v. Anderson*, 796 F.2d 1009 (8th Cir. 1986). Direct evidence "refers to the causal strength of the proof," *Richardson v. Sugg*, 448 F.3d 1046, 1058 (8th Cir. 2006), meaning such evidence "must be strong enough to show a specific link between the [alleged] discriminatory animus and the challenged decision, sufficient to support a finding by a reasonable fact finder that an illegitimate criterion actually motivated the employment decision." *Schierhoff v.GlaxoSmithkline Consumer Healthcare, L.P.,* 444 F.3d 961, 965 (8th Cir. 2006). This category of proof "includes 'evidence of conduct or statements by persons involved in the decision making process that may be viewed as directly reflecting the alleged discriminatory attitude,' where it is sufficient to support an inference that discriminatory attitude more likely than not was a motivating factor." *Id.* at 966 (quoting *Radabaugh v. Zip Feed Mills, Inc.*, 997 F.2d 444, 449 (8th Cir.1993)). Direct evidence does not include "stray remarks in the

workplace, statements by non-decision makers, or statements by decision makers unrelated to the decisional process." *Radabaugh*, 997 F.2d at 449.

Here, Smith did not identify any direct evidence of discriminatory intent. Smith did not allege that DFA acted or spoken in a way which demonstrates directly that race or gender were factors in the employment decision. In fact, Smith testified:

> Q:  Have you ever heard a DFA employee make a racially derogatory comment to you?
> A:  I have not.
> Q:  Have you ever heard of a racially-derogatory comment in writing or in person?
> A:  No.
> Q:  Have you ever heard an employee say or write that they heard any other employees make a derogatory comment about your or anyone else?
> A:  No.
> Q:  Racially derogatory.
> A:  No.
> Q:  Have you ever heard anyone say that white employees are harder working or better than African-Americans?
> A:  No.

(Ex. "A", 93:23-25; 94:1-14)

Without any direct evidence, it follows that Smith's claims should be analyzed under the burden-shifting framework set forth in *McDonnell Douglas*.

## II.  **Smith must prove intentional discrimination under the McDonnell Douglas Analysis.**

In the absence of direct evidence, Smith must show that she was a member of a protected group, was meeting the legitimate expectations of the employer, suffered an adverse employment action, and that "similarly situated" employees who were not members of the protected group were treated differently. *Clark v.*

*Runyon*, 218 F.3d 915 (8th Cir. 2000) (emphasis added). A plaintiff's subjective belief that he was treated differently than similarly situated non-minority employees is not sufficient to carry the burden of proof. *Canaday v. Wal-Mart Stores*, 440 F.3d 1031, 1034 (8th Cir. 2006).

If the plaintiff makes a prima facie showing, the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for its actions. If the employer meets that burden, the presumption of retaliation or discrimination disappears and the plaintiff must show that the employer's stated reason was a pretext for unlawful discrimination. *Logan v. Liberty Healthcare Corporation*, 416 F3d 877 (8th Cir. 2005).

## A. Smith's comparators are not similarly situated to her.

There is no dispute that Smith was a member of a protected class or that she suffered an adverse employment action. To establish her *prima facie* case Smith must show that similarly situated employees who were not members of the protected group were treated differently. It is the plaintiff's burden to "show that she and the employees outside of her protected group were similarly situated in all relevant respects." *Bone v. G4S Youth Services, LLC*, 686 F.3d 948, 956 (8th Cir. 2012); *Twiggs v. Selig,* 679 F.3d 990, 993–94 (8th Cir. 2012).

At the pretext stage, "the test for determining whether employees are similarly situated to a plaintiff is a rigorous one." *Rodgers v. U.S. Bank, N.A.*, 417 F.3d 845, 850 (8th Cir. 2005). It is the plaintiff's burden to "show that she and the identified employees, outside of her protected group, were similarly situated in all relevant respects." *Bone v. G4S Youth Services, LLC*, 686 F.3d 948, 956 (8th Cir. 2012); *Twiggs v. Selig,* 679 F.3d 990,

993–94 (8th Cir. 2012). A comparator must be "similarly situated in all relevant respects," and "the relevant respects are the conduct of the employees and any disparity in their discipline." *Chappell v. Bilco Co.*, 675 F.3d 1110, 1119 (8th Cir. 2012). The employees "used for comparison must have dealt with the same supervisor, have been subject to the same standards, and engaged in the same conduct without any mitigating or distinguishing circumstances." *Muor*, 716 F.3d 1072, 1078 (8th Cir. 2013) (citing *Wierman v. Casey's Gen. Stores*, 638 F.3d 984, 994 (8th Cir. 2011) (quoting *Cherry v. Ritenour Sch. Dist.*, 361 F.3d 474, 479 (8th Cir.2004))

Here, Smith received a promotion. Smith was promoted from a pay grade of N909 to a SE01, with a raise of annual salary of $6,022 (from $102,088 to $108,100). (SUMF ¶ 21)

She claims that she was intentionally discriminated against because some other N909s employees were promoted to a different pay grade. These employees were not similarly situated to her. 16 employees, including Smith, were graded at N909, N906, or N907. All of the employees were promoted to SE01 with a pay raise of approximately $6,200 per year. The other six employees were promoted to SE02. These six employees were not similarly situated to Smith and the other nine employees did not get TWO.

In his deposition, Paul Louthian identified the job duties of Smith's comparators:

Duncan Baird was responsible as Administrator of the $30 billion State budget, including State and general revenues, special revenues, federal services and other revenues. He supervises approximately 20 employees and has input in State policy. (*SUMF* ¶ 17). Baird's supervisor was Carla Haugen. Ex. "T",

Chris Howlett is the Administer for health insurance policies of over 28,000 State agency employees and for the teachers' insurance program. The plans are very large and complex with contracts for health insurance, medical insurance and pharmaceutical contracts. He supervises approximately 75 to 100 employees that are part of the process. He has input into State policy. (*SUMF* 18). Howlett's supervisor was Carla Haugen.

Ed Armstrong is the Administrator who is responsible for state procurement and is Administrator of $1.6 billion. He oversees the commodities, professional contracts from a State policy standpoint for all state agencies. He supervises 28 to 30 professional level employees. (*SUMF* ¶ 20). Armstrong's supervisor was Carla Haugen. (SUMF

Kay Barnhill is Administrator of the OPM who is responsible for state policy and procedure for personnel and payroll. 28,000 state employees come under her purview either through the paid plan or the approval of positions and titles for grants and procession of weekly payrolls. She is responsible for approximately $2 billion. The majority of her job duties were to make State policy. Her office writes all of the OPM State policies for all State employees; grades and classifies all State of Arkansas employees; writes personnel policy including the OPM manual. (SUMF ¶ ). Barnhill's supervisor was Carla Haugen.

Ricky Quattlebaum is the DFA Internal Auditor. He reports to Governor Hutchison. (*Id.* at 89:14-23). Quattlebaum is responsible for directing the Office of Internal Audit whose mission was to perform operations and compliance audits, consolation activities and investigators of fraud, waste and abuse of government resources of executive branch agencies under the control of the Governor. Quattlebaum's supervisor was Paul Louthian.

Kenneth Williams oversaw the Technology Deportment for DFA. He had responsibility for the accounting system of AASIS and the TAPS programs that are used for individual,

corporate, partnership, retirements, excise tax, which included sales tax and other taxes, licenses, and drivers' licenses, and motor vehicle licenses. He was responsible for approximately 50 employees and they are highly technical. (*Id.* at 86:12-25). He is responsible for a budget of $40 million a year. (*Id.* at 87:1-9). Williams's supervisor was Carla Haugen.

Contrarily, Smith identified in her deposition that her different job duties were:

Smith was the Administer of Stop Violence Against Women and Family Violence Prevention Services Act grants. The grants that she managed had an annual total amount of $20 million to $23 million per year in the office of IGS; operated the state clearinghouse; managed the statewide records destruction of records policy; and managed Information Technology cost project to provide planning and support to all state agencies across the state, acting in their plan for purchasing IT exceeding $100,000. She had very little input into statewide DFA policy. Only policies that effected the grants made by IGS and the structure of the grants.

Smith and the above employees are not similarly situated in all relevant respects. Baird is responsible for the State budget in the amount of $30 billion and has input into State policy. Howlett is responsible for health insurance policies of over 28,000 State employees. He supervises 75 to 100 employees. Armstrong is responsible for state procurement and is Administrator of $1.6 billion. Barnhill is the Administer of the OPM. She is responsible for $2 billion and the majority of her job was to make State policy for all State employee and she wrote the OPM manual. Quattlebaum is the Administrator of the Technology Department. He is responsible for an annual budget of $40 million. He supervises 50 highly technical employees.

Smith's comparators are not similarly situated to those that she has identified. She oversees: grants, the clearinghouse, the destruction of records, and the purchasing of IT exceeding $100,000. She oversees pass through grant funds of approximately $23 million. Her

supervisor is Louthian which is different from all six comparators except Quattlebaum. The comparators are subject to different standards than Smith and engaged in different jobs. Mitigation and or distinguishing circumstances would have to be made to show similarities. *Muor v. U.S. Bank Nat. Ass'n*, 716 F. 3d 1072, 1078 (8th Cir.)

### B. Smith cannot establish a causal connection between her race and DFA's failure to give Smith a second promotion.

But even if the Court finds that Smith has made a *prima facie* case, DFA had a legitimate, non-discriminatory reason for not making her a second promotion. Under the *McDonnell Douglas* burden-shifting framework, once an employee establishes a *prima facie* case, the employer may provide a legitimate, non-discriminatory justification for its conduct, which rebuts the employee's *prima facie* case. The employer's burden to do so is not at all onerous. *Bone,* 686 F.3d at 954.

In *Bone*, the United States Court of Appeals for the Eighth Circuit found that the defendant met its burden by stating that it discharged the plaintiff for, among other things, lying to supervisors. *Id*. The Court of Appeals held that the employer had a legitimate, non-discriminatory reason for terminating the plaintiff even though she argued that she had not actually lied. *Id*. at 955. The Court of Appeals made clear that courts "do not sit as super-personnel departments reviewing the wisdom or fairness of the business judgments made by employers, except to the extent that those judgments involve intentional discrimination." *Id*. at 955 (internal quotation omitted). Once the employer clears this low hurdle, a plaintiff cannot prevail unless he or she proves that the employer's proffered justification is merely a pretext for discrimination. *Id*. at 954. In determining whether a plaintiff

has met her burden of proving pretext at the summary judgment stage, courts are "prohibited from making a credibility judgment or a factual finding from conflicting evidence." *Yates v. Rexton, Inc.,* 267 F.3d 793, 800 (8th Cir. 2001).

Here, it is readily apparent that DFA had a legitimate, non-discriminatory reason for not making a second promotion for Smith to classify her to SE02. As explained above, the committee chose other employees based on the factors. Smith did not give a reason why she did not receive a second promotion based upon her race. Being "unfair" does not create a cause of action under Title VIII. Smith merely speculates that her lack of a second promotion was based upon her race. She has no evidence whatsoever supporting her claims of intentional discrimination. Taking Smith's allegations as true, she cannot prevail on her claims for racial discrimination.

## III.    Smith cannot make a *prima facie* case of termination based on race discrimination.

### A. Smith has not identified any similarly situated comparators.

As stated above, to prove a prima facie case, Smith must show that similarly situated employees who were not members of the protected group were treated differently[comparators]. *Bone.* Smith has not identified any comparators as it relates to her termination. Her complaint does not name any employees as comparators and, in fact, Smith's counsel stated in Smith's deposition:

> Q:    So you are saying that you don't have any comparators for the termination issue?
>
> A:    [Mr. Porter]: No we don't.

18

(*SUMF* ¶ 54)

Without the showing of a similarly situated employee, Smith's *prima facie* case of termination based upon race fails. Smith's separate claim of termination based upon race should be dismissed.

### B. **DFA had a legitimate, non-discriminatory reason to terminate Smith.**

### (i) **First Implementation Plan**

Even if the Court finds that a *prima facie* case has been made, it was Smith's ultimate responsibility to submit and to have approved an implementation plan to receive a STOP grant. (*SUMF* ¶ 27). She was also responsible for the overall office. (*SUMF* ¶ 26). Even though she was ultimately responsible, she claimed that Autumn Hemphill and Debbie Bousquet were ultimately responsible for the plan. (*SUMF* ¶ 28). Smith believed it was not her responsibility to put the plan together, even though he testified that he had the ultimate responsibility. (*SUMF* ¶ 30.5). Smith had the responsibility of ensuring that the staff was performing its duties as assigned. (*SUMF* ¶ 30).

In spite of being ultimately responsible for the submission of the plan, Smith did not actually review the plan. (*SUMF* ¶ 31). The first plan was submitted without the documents that were required by OVW. (*SUMF* ¶ 35). On the day the first plan was submitted, Smith was on vacation in Italy. (*SUMF* ¶ 34)

The first STOP grant was submitted on June 28, 2017 but was not approved. (*SUMF* ¶ 37). Smith failed in her responsibility to have the first plan approved.

### (ii) **Second Implementation Plan**

Smith reviewed the documents for the second plan as they made revisions to the plan and ensured that they had all the required elements into the plan. (*SUMF* ¶ 38). Smith did not see or use the template for the second plan that was provided by the OVW. (*SUMF* ¶ 39). Smith was more involved in the preparation and submission of the second plan second plan because she said that she was ultimately responsible for the plans. (*SUMF* ¶ 40). Smith knew about the OVW website that could help put together the plan. (*SUMF* ¶ 41)

Unlike the first plan, Smith directly oversaw the second plan. The technical team assured that they had meetings with the Advisory Board and received the documents, reviewed the documents that had been pulled together and gathered communications. (*SUMF* ¶ 42). The second plan was submitted in November 2017. (*SUMF* ¶ 43). The second plan was not approved by OVW. (*SUMF* ¶ 43)

### (iii)    Third Implementation Plan

Since the plan was rejected twice, the funds could not pass through the STOP grant funds to the recipient agencies. The agencies needed money to function so IGS borrowed money from the State rainy day fund. (*SUMF* ¶ 44). Because the first and second grants were not approved, sub-grantees, who rely on the STOP grant funds, such as battered women shelters, couldn't operate. (*SUMF* ¶ 44)

Again, Smith failed to provide proper documentation to the OVW. (*SUMF* ¶ 48). On February 16, 2019, Paul Louthian assigned Hemphill, Melanie Hazeslip, and Stacy Crawford to work on the third plan. (*SUMF* ¶ 46). Doris was removed from the STOP grant project. (*SUMF* ¶ 45)

On April 3, 2018, DFA terminated Smith's employment. The basis of the termination was that she failed to carry out her job duties, acted insubordinately, and directed employees

under her supervision. She failed to provide the required documentation to OVW and this was one reason that OVW did not approve grant money to Arkansas. (*SUMF* ¶ 46)

Smith failed to be forthcoming with the Director which threatened the integrity of the grant program. (*SUMF* ¶ 50)

Smith acted insubordinately towards the Director and her supervisor and instructed employees under her supervision to disregard his insurrections. (*SUMF* ¶ 50)

On April 6, 2018, IGS submitted the third plan to OVW. (SUMF ¶ 51). On April 23, 2019, the third STOP grant was approved by OVW. (SUMF ¶ 52)

**IV.     Smith has not proven a case of retaliation.**

To establish a prima facie case of retaliation, an employee has the initial burden of establishing retaliation by showing that (1) she engaged in protected conduct; (2) she suffered a materially adverse employment action; and (3) the adverse action was causally linked to the protected conduct. *Jackman v. Fifth Judicial Dist. Dept. of Correctional Services*, 728 F.3d 800 (8th Cir.). Further, retaliation must be the "but for" cause of the adverse employment action *Univ. of Texas Sw. Med. Ctr. V. Nassar*, 570 U.S.338 (2013)

**A.  First EEOC Charge of Discrimination and Classification**

On March 21, 2017, Smith filed the first EEOC charge, stating that she found out that her position was the only one not re-classified. In fact, on March 3, 2017, the Governor signed Act 289 of 2017 which authorized Smith at pay grade SE02. At the time of filing the Charge, DFA's classifying of Smith's pay grade could not have been the causal connection. Ark. Code Ann. § 21-5-110, set forth that the OPM was to implement the pay grades after the General Assembly authorized the pay grade. The classification was implemented pursuant to the dictates of the law, not for retaliation. There was no cause connection for DFA to retaliate.

Smith claims that the adverse action is that her pay grade was not re-classified. To prove retaliation, Smith must show that she would have been re-classified 'but for' DFA's conduct.. DFA simply took 16 employees, including Smith, and promoted them. Smith was promoted from N909 to SE01. Smith would have been given the promotion regardless of her filing the Charge. The re-classification was implemented by the classification committee pursuant to Ark. Code Ann. § 21-5-110 according to the above mentioned factors.

Moreover, DFA's conduct lacks temporal proximity because the alleged retaliation occurred approximately four months after the filing of the Charge.

**B. Second Charge of Discrimination and Termination**

On October 31, 2017, Smith filed a second Charge, stating that DFA had refused to upgrade her position and that she had been treated differently since she filed her first charge. In addition, she claimed that she was demoted with a reduction in pay and continues to be treated differently with respect to harassment and intimidation.

The alleged retaliation is Smith's termination on April 3, 2018. Nearly 13 months elapsed from the first Charge to the termination and nearly 5 months lapsed since the filing of the second Charge the termination lacks temporal proximity. Nevertheless, DFA terminated Smith for a legitimate, non-discriminatory reason.

Smith's claim that she was treated differently with respect to harassment and intimidation should be dismissed for lack of evidence. Nevertheless, there is no genuine issue of material fact as to retaliation and it should be dismissed.

**CONCLUSION**

For all of the above stated reasons, there remain no genuine issue of material fact and DFA is entitled to summary judgment as a matter of law.

WHEREFORE, Defendant, Department of Finance and Administration, prays that its Motion for Summary Judgment be granted and Plaintiff's Complaint be dismissed.

Respectfully submitted,

Leslie Rutledge
Attorney General

By:   Robert T. James
      Robert T. James
      Arkansas Bar No. 91008
      Assistant Attorney General
      323 Center Street, Suite 200
      Little Rock, Arkansas 72201
      Telephone: (501) 682.3658
      Fax: (501) 682.2591
      robert.james@arkansasag.gov

*Attorneys for Defendant*

## CERTIFICATE OF SERVICE

I, Robert T. James, Assistant Attorney General, hereby certify that on January 23, 2020, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which shall send notification of such filing to any CM/ECF participants:

Austin Porter, Jr.
PORTER LAW FIRM
323 Center Street, Suite 1035
Little Rock, Arkansas 72201

      Robert T. James
      Robert T. James