IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
CENTRAL DIVISION


DORIS R. SMITH                                                    PLAINTIFF

VS.                                    CASE NO. 4:17-CV-00857 JM

DEPARTMENT OF FINANCE
and ADMINISTRATION                                               DEFENDANT

PLAINTIFF'S BRIEF IN SUPPORT IN OPPOSITION
OF THE DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Introduction

This is a civil rights action brought pursuant to 42 U.S.C.S. § 2000 *et seq*.  (Title VII of the

Civil Rights Act of 1964, as amended), and pursuant to the Fourteenth Amendment to the United

States Constitution, in order to recover damages against the defendant for the unlawful

employment practices that the plaintiff Doris R. Smith has been subjected to on account of her

race and in retaliation for having complained about discriminatory treatment.  The plaintiff also

seeks relief pursuant to 42 U.S.C.S. § 1983, in that the unlawful employment practices were

committed by the defendant while acting under color of law.  This is also an action for declaratory

judgment pursuant to 28 U.S.C.S. § 2201 to declare the rights and other legal relations between

the parties.  The plaintiff is also seeking equitable relief and injunctive relief as well.


Statement of Facts

Doris Smith received her bachelor's degree in Accounting and a minor in Computer

Information Systems from Southern Arkansas University in Magnolia, Arkansas.  (**See Deposition**

**of Doris Smith attached herein as Plaintiff's Exhibit "A", p. 7**).  Ms. Smith is also a certified

public accountant. Ms. Smith became employed by the Arkansas Department of Finance and

Administration (DF&A) in April 2004. Ms. Smith was hired in a position called the Internal Auditor's position. When Ms. Smith was hired, she was classified as "exceptionally well qualified applicant." After the Internal Auditor's position, Ms. Smith then became the grants administrator supervisor. During Ms. Smith's tenure with DF&A, she has received five (5) promotions. Ms. Smith was next promoted to the Program Support Manager's position, and was next promoted to the Assistant Administrator's position. Ms. Smith was finally promoted to the position of Administrator in the Office of Intergovernmental Services. (**Smith's depo., p. 8**).

The Office of Intergovernmental Services manages federal grant awards. Ms. Smith's office makes applications for federal grants, and then receive the federal warrants, and then administer those grants. Ms. Smith's office operated the only state clearinghouse, which served as the public notice of venue for not only other state agencies, but even local agencies. Ms. Smith's office also managed the statewide records retention policies. When a state agency was contemplating destroying state records, they would contact Ms. Smith's office for guidance in the destruction of records. (**Smith's depo., p. 9-10**).

The Office of Intergovernmental Services also managed state information technology cost analysis. Whenever a state agency wanted to purchase information technology that exceed $100,000.00, they would have to submit their proposal to Ms. Smith's office for cost analysis. (**Smith's depo., p. 10**). Ms. Smith's office also administered the following grants: Victim of Crimes Act (VOCA), Family Violence Services Prevention Services Act (FVPSA), grants through the Bureau of Justice Assistance. The Office of Intergovernmental Services also administers smaller grants as well, such as the Coverdell grant. Ms. Smith's office also administered state grants that provided support for domestic violence agencies. (**Smith's depo., p. 10**).

Ms. Smith's office was responsible for reviewing IT purchases for all state agencies that exceeded $100,000.00. Ms. Smith's office had to review these proposals. There were individuals who worked under Ms. Smith's supervision who had IT degrees. Ms. Smith's office also served as the central repository for IT information as well. Ms. Smith's office also oversaw website portals. Within the Intergovernmental Services was the Department of Information Services. (**Smith's depo., p. 11**). It was this Department of Information Services that had the role of overseeing all state agencies IT purchases. Ms. Smith's office had to ensure that the IT plans and purchases had to be consistent with their IT architecture, to ensure that it complied with the infrastructure of the state. (**Smith's depo., p. 13, 16**). Again, any state agency that wanted to make an IT purchase over $100,000, had to submit its plan to Ms. Smith's office for review and approval. (**Smith's depo., p. 14-15**).

Ms. Smith's office served as the administrator for all federal grants to state and local agencies. They also served as grants administrator for non-profits as well. These grants went to local police departments, prosecuting attorney's offices, and other local agencies. Ms. Smith's office was a pass-through agency for these federal grants. Ms. Smith's office monitored those grants, and monitored the spending of those federal dollars to ensure that they were in compliance with federal law. Ms. Smith's office also audited those programs as well. Ms. Smith's office also responded to issues and requests from their constituents. They also took representatives from the federal government to local agencies to see how the grants were being carried out. Ms. Smith's office also responded to legislative inquiries. Ms. Smith would have to go to the Arkansas Legislature to respond their inquiries. (**Smith's depo., p. 15**).

The administrators that served in Management Services were: Ed Armstrong, Duncan Baird, Kay Barnhill, Chris Howlett, Ricky Quattlebaum, Kenneth Williams, John Shellnut, and

Doris Smith. (**Smith's depo., p. 39-40**). These administrators were all N909s prior to July 1, 2017. Other than Ms. Smith, all of the N909s are Caucasian. (**Smith's depo., p. 23, 39**). Since Doris Smith's termination, there are no African-American Administrators who work in DFA Management Services. (**See Deposition of Paul Louthian attached herein as Plaintiff's Exhibit "B", p. 80-81**). When Doris Smith worked at DF&A – Management Services, she was the highest ranking African-American. (**Louthian's depo., p. 10**).

Prior to December 2016, Paul Louthian was the administrator for the Office of Accounting. Mr. Louthian was a N909, just like Doris Smith. (**Louthian's depo., p. 8**). Carla Haugen was the Administrator for the Office of Administrative Services. Ken Williams was the Chief Information Officer. Duncan Baird was the Administrator for Office and Budget. (**Louthian's depo., p. 16**). All of the administrators within Management Services were N909s, with the exception of Ricky Quattlebaum, who was a N907. (**Louthian's depo., p. 30**). Timothy Leathers was the deputy director for DF&A, and previously served as Ms. Smith, and the other administrators' supervisor, including Paul Louthian. (**Louthian's depo., p. 10**) (**See August 29, 2016 Organization Chart attached herein as Plaintiff's Exhibit "C"**). Timothy Leathers retired sometime towards the end of 2016, and Paul Louthian became the Deputy Director, having supervisory authority over Doris Smith. (**Louthian's depo., p. 15**). When Mr. Louthian became a deputy director, along with Carla Haugen, they split up Mr. Leather's responsibilities, splitting off the supervisory responsibility of the administrators. Mr. Louthian and Ms. Haugen both received raises for assuming Leather's duties. (**Louthian's depo., p. 9**). When Mr. Louthian was promoted to the Deputy Director/Comptroller position within the Division of Finance, he assumed supervision over Doris Smith, John Shelnutt, and Ricky Quattlebaum. Doris Smith was the Administrator over the Office of Intergovernmental Services, John Shelnutt was the Administrator over the office of

Economic Analysis and Tax Research, and John Shelnutt was the Administrator over the Office of Internal Audit. (**See Organization Chart – December 13, 2016 attached herein as Plaintiff's Exhibit "D"**).

Prior to SB289 being introduced in February 2017, Mr. Louthian spoke with Kay Barnhill about where he felt his two (2) direct reports – Doris Smith and Ricky Quattlebaum should be placed on the new pay scale. Mr. Louthian expressed the belief that Doris Smith should be placed at the GS-15 pay level, while Ricky Quattlebaum should be placed at the SE-01 pay scale. This was during a casual conversation that Mr. Louthian had with Ms. Barnhill. When Mr. Louthian expressed his opinion about where Smith and Quattlebaum should be placed on the new pay scale, he did not rely on any writing, or any analysis that was done. (**Louthian's depo., pp. 27-28**). At the time that Mr. Louthian spoke to Kay Barnhill about the placement of both Quattlebaum and Smith, she was in a higher pay grade than Quattlebaum. Mr. Quattlebaum was N907, while Ms. Smith was a N909. (**Louthian's depo., p. 30**). In essence, Mr. Louthian was proposing that Mr. Quattlebaum should go to a higher pay grade, while Ms. Smith should go to a lower pay grade. (**Louthian's depo., p. 31**).

Ms. Smith first learned of SB289 on February 7, 2017. The State of Arkansas underwent a pay compensation plan study. It was fairly common knowledge that the state was undergoing this pay study plan, and that state employees would be placed on new pay scales. (**Smith's depo., p. 17**). The State of Arkansas was attempting to simplify the pay structure. Sometime in December 2016, Ricky Quattlebaum came to the plaintiff and advised her that he had learned that under the new pay plan structure, DF&A was proposing to place she and Quattlebaum at the GS-15 pay structure, while placing the remaining N909s at the SE02 pay level. (**Smith's depo., p. 18, 20**). Prior to the pay plan study, Ms. Smith and the other Administrators were N909s. Ms. Smith was

making $102,000.00 per year. (**Smith's depo., p. 19**). Ricky Quattlebaum was a N907, which was below the pay scale for Doris Smith. (**Smith's depo., p. 18**).

In late December 2016, a meeting took place with management services for the purpose of discussing a new electronic system – EASE. All of the administrators were required to attend the meeting, but Ms. Smith could not attend due to other more pressing commitments dealing with federal grants. Apparently after the meeting had almost ended, it was mentioned by management officials that the pay plan had been completed, and that all of the administrators were being placed at the SE-02 (Senior Executive) pay level, while Mr. Quattlebaum and Ms. Smith would be placed at the GS-15 pay level. (**Smith's depo., p. 20, 23**).

When Ms. Smith saw SB289 in early February, she went to speak with Kay Barnhill about the matter. Ms. Smith saw that this bill was placing her at the GS-15 pay level, as she had been told earlier by Ricky Quattlebaum. Ms. Smith saw that all of the other administrators had been placed at the SE02 pay level. Ms. Smith noticed that all of the administrators previously at the N909 and N907 had been placed at the SE02 pay level, and that she was the only administrator in Management Services who was being placed at the GS-15 pay level. (**Smith's depo., p. 24**). Although Ricky Quattlebaum told Ms. Smith that they were both being placed at the GS-15 pay level, she noticed that Mr. Quattlebaum, previously at the N907 pay level, was going to the SE02 pay level, with other administrators, all of whom were Caucasian. (**Smith's depo., p. 24**). Although Ricky Quattlebaum was slated to be a GS-15, he had conversations with Paul Louthian, requesting to be moved to the SE02 pay grade, which Louthian honored. (**Smith's depo., p. 95-96**).

When Ms. Smith found out that she was being placed below all of her contemporaries, all of whom are white, she went to Kay Barnhill, to try and get some answers. (**Smith's depo., pp.**

**24-25**).     Kay Barnhill is the administrator of the Office of Personnel Management. (**Smith's depo., p. 27**) (**See also Plaintiff's Exhibits "C" and "D"**).     Again, all of Ms. Smith's contemporaries were white, and were being placed at the SE-02 pay level, while the plaintiff was being placed at the GS-15 pay level.  (**See Plaintiff's Exhibit "E-1"**).  The pay plan was scheduled to take effect July 1, 2017.  (**Smith's depo., p. 28**).   Paul Louthian stated that had he been in Ms. Smith's shoes, he would have been concerned as well, and would have been asking questions. (**Louthian's depo., pp. 37-38**).     Mr. Louthian stated that Doris Smith was the only African-American administrator.   Mr. Louthian stated that of all the administrators in management services, Ms. Smith was the only administrator who was being proposed to drop down to the GS-15 pay grade. (**Louthian's depo., p. 37**).

When Ms. Smith was not getting her questions answered, she reached out to the Equal Employment Opportunity Commission (EEOC).  Ms. Smith filed a Charge of Discrimination with the EEOC on February 10, 2017.  (**Smith's depo., p. 29**).  The EEOC notified the Department of Finance and Administration on February 16, 2017.  This notice was sent to Amy Valentine of Human Services for DF&A.  (**See Plaintiff's Exhibit "F"**).   Shortly after getting the Notice of Charge filing by Doris Smith, SB289 was amended on February 21, 2017, to place Ms. Smith's position at the SE02 pay grade.  (**See Plaintiff's Exhibit "E-2"**).   However, Ms. Smith did not find out that the amended bill was placing her position in the SE02 pay grade until July 7, 2017. (**Smith's depo., p. 28**).

When SB289 was amended placing Ms. Smith's position at the SE02 pay grade, Mr. Louthian did not agree with the placement.  The placement of Ms. Smith's position at the SE02 position, rather than the GS-15 pay grade was done without the approval of Paul Louthian. (**Louthian's depo., p. 44**).  Mr. Louthian did not have any input in the decision to place Ms.

Smith's position at the SE02 position. (**Louthian's depo., p. 45**). On July 7, 2017, Ms. Smith held a meeting with Paul Louthian and Carla Haugen to discuss some issues that she was having regarding her inability to fill vacancies within her department. (**Smith's depo., pp. 29-30**). It was at this meeting that Ms. Smith found out for the first time that her position was being placed at the SE01 position, rather than the GS-15 position. (**Louthian's depo., p. 47**) (**Smith's depo., p. 28**).

One of the federal grants that the office of intergovernmental services administers is the STOP Grant, which is from the Department of Justice Office of Violence to Women (OVW). This is a grant application that has to be submitted that allows federal monies to pass through the Office of Intergovernmental Services to local law enforcement agencies, and prosecuting attorney offices. When the STOP Application was submitted, the plaintiff was on vacation in Italy. The plan was submitted on June 28, 2017. Debbie Bousquet works in Intergovernmental Services, and is African-American. Ms. Bousquet had direct responsibility for preparing the STOP Plan application, while working under the direct supervision of Autumn Hemphill, who is the Assistant Administrator to Doris Smith. It was Autumn Hemphill's daily responsibility, working along with Debbie Bousquet to see that the necessary paperwork for the STOP Plan was put together and submitted with the plan. (**Smith's depo., pp. 46-47**). The plan was filed on time – June 28, 2017, with the necessary paperwork, again, while the plaintiff was travelling out of the country, on her approved vacation. (**Smith's depo., pp. 46-47**).

Autumn Hemphill is Caucasian. The STOP Plan (the plan) was filed electronically in the Federal Grants Management System on June 28, 2017. Ms. Smith had no knowledge that the plan had been submitted without the necessary paperwork. (**Smith's depo., p. 47**). Ms. Smith's vacation had been pre-approved by Paul Louthian, Deputy Director. Debbie Bousquet was the program manager for the STOP Plan. Ms. Bousquet had been the plan manager for years, and had

always submitted the plan in years prior, without any problems. (**Smith's depo., p. 48**). Although Ms. Smith is the Administrator over the office of intergovernmental services, and part of her job responsibility as the administrator is to ensure that the program requirements are being met, she delegated certain duties and responsibilities out to her subordinates. Autumn Hemphill is the Assistant Administrator, and has direct oversight over all of the managers, and is to review any plans that are being submitted. Ms. Hemphill was well aware that Ms. Smith was on vacation. Ms. Smith did not review the STOP Plan before it was submitted, because she delegated those responsibilities to Autumn Hemphill. (**Smith's depo., p. 49**).

As the Administrator for Intergovernmental Services, Ms. Smith conducts weekly meetings with her staff. Again, Ms. Bousquet worked directly on putting the plan together, and her work was supposed to have been reviewed by Autumn Hemphill. Ms. Smith holds staff meetings on Mondays, and gets weekly reports from her staff about the various applications that are being put together. Ms. Bousquet would report that the application for the plan is moving along well, and that there were no problems. Autumn Hemphill would also confirm that the work on the plan was moving along well. The plan was due on June 30, 2017, and was submitted on June 28, 2017. In the past, there was never an issue with the STOP plan application. (**Smith's depo., p. 50-51**). Debbie Bousquet prepares the plan application, working under the direct supervision of Autumn Hemphill. Part of Autumn Hemphill's responsibility is to ensure that all of the paperwork is being submitted with the plan application. Ms. Smith has direct responsibility over the office, and delegate various duties to her Assistant Administrators, and her managers. (**Smith's depo., p. 52**). Ms. Smith has 28 FTE positions, but had seven (7) vacancies. Ms. Smith was having difficulty filling the vacancies within her office, due to Paul Louthian not allowing her to fill these vacancies,

which was putting a strain on Ms. Smith's staff, and was making it difficult to get the work done. (**Smith's depo., p. 29-32**).

There were various documents that were submitted with the original plan application as required by the federal requirements. On September 7, 2017, Omar Mohammed notified Debbie Bousquet that the 2017 STOP Implementation Plan would not make it through the approval process. Mr. Mohammed advised Ms. Bousquet that the 2017 STOP Implementation Plan could not be a repeat "with minor changes,' of the 2014 STOP Implementation Plan that had been approved. Due to changes that had taken place, requiring additional documents, Ms. Bousquet was required to re-submit the plan on behalf of the State of Arkansas. (**See Plaintiff's Exhibit "G"**). The 2017 STOP Implementation Plan had some new elements that needed to be included that was not required for the 2014 STOP Implementation Plan. (**Smith's depo., p. 55**) (**See also Louthian's depo., p. 49**). Ms. Smith was assured that Debbie Bousquet was using the OVW Checklist as required when submitting the 2017 STOP Implementation Plan. (**Smith's depo., p. 56**).

The plan was resubmitted in November 2017. The plan had all of the required documents. After submitting the plan, Ms. Smith and her team received positive feedback from OVW's technical assistance team. (**Smith's depo., pp. 62-63**). On November 15, 2017, Mary Seighman, who is contracted by OVW to provide technical assistance, sent an email to Omar Mohammed, and cc to Doris Smith, Autumn Hemphill, Jenna Musselman-Palles, and Debbie Van Winkle. In the email, Ms. Seighman writes: "Hi Doris, Autumn, and Debbie," "I think you have done a great job of including information that was not in the original AR plan!" (**See Plaintiff's Exhibit "H"**). Again, Ms. Seighman was contracted by the feds to provide technical assistance to the States with their grant applications. (**Louthian's depo., p. 64-65**).

After the first submission was rejected, Doris Smith became more involved in the plan's second submission. Ms. Smith directly oversaw the plan's submission. Ms. Smith conducted calls to OVW and the technical team (Mary Seighman).  Ms. Smith was conducting meetings with the advisory board.  Ms. Smith reviewed the documents that were being submitted. When the plan was submitted, Ms. Smith and her team received positive feedback, stating that everything looked good. (**Smith's depo., pp. 64-66**).

After submitting the second grant application in November 2017, Ms. Smith contacted Omar Mohammed in December 2017, and he stated that they were still reviewing the plan.  Mary Seighman stated that everything looked good, and that Ms. Smith and her team had done a great job in putting the plan together. (**Smith's depo., pp. 78-79**).  In late January or early February 2018, Ms. Smith and her team received communication from Omar Mohammed and Amy Louder, the director of OVW, stating that they wanted some changes to the plan. Ms. Louder was not specific about the additional information that was needed in the plan.  Ms. Smith and her team started putting the additional documents to the plan.  One of the things that they requested was getting more grass root input into the grant application. (**Smith's depo., pp. 78-80**).  Ms. Seighman stated that they needed more information in the plan from their stakeholders, other than from the advisory board.  (**Smith's depo., p. 80**).

Once the required information was pulled together, Omar Mohammed requested a follow-up teleconference to take place on February 15, 2018.  Paul Louthian directed that the teleconference take place in his office.  When Ms. Smith arrived at Paul Louthian's office with Debbie Bousquet, Malenie Hazeslip and Stacy Crawford were there as well. During the meeting, Doris took the lead on the call with Omar Mohammed.  Mr. Mohammed sent an email the following day saying that the meeting was productive.  (**Smith's depo., p. 82**). Also, Mr.

Mohammed was inquiring about the status of refunding the funds that had been illegally withdrawn at Mr. Louthian's direction. (**See February 16, 2018 email attached herein as Plaintiff's Exhibit "I"**).

On February 16, 2018, Paul Lothian removed Doris Smith and Debbie Bousquet (both African-American) from the STOP Plan team. Debbie Bousquet would only be consulted should the need arise. (**Smith's depo., pp. 84-85**). Paul Louthian assigned Stacy Crawford, Melanie Hazeslip, and Autumn Hemphill to work on the STOP plan 24/7, and they were sequestered in his office. This team did nothing but work on the STOP plan. (**Louthian's depo., pp. 71-73**). This team worked on the plan for two (2) straight months. Just as Ms. Smith, Ms. Hemphill, and Ms. Bousquet did, the new team submitted the plan in pieces to Mr. Mohammed and Ms. Sieghman in order to get their feedback. (**Louthian's depo., p. 73**). Work on the plan was their "total focus." During this process, Mary Seighman would be making suggestions about the partial plan that they were submitting, just as Ms. Smith and her done had done. (**Louthian's depo., p. 74**). On April 3, 2018, DF&A terminated the employment of Doris Smith. The plan was finally submitted on April 6, 2018. The plan received approval finally on April 23, 2018. (**Louthian's depo., pp. 75-76**).

Statement of Law

A.      <u>Summary Judgment Standard</u>

Pursuant to Rule 56 of the Federal Rules of Civil (FRCP), a movant is entitled to an order granting summary judgment when there is no genuine issue as to any material fact.

> Summary judgment can properly be entered when there are no genuine material facts that can be resolved by a finder of fact; that is, there are no facts which could reasonably be resolved in favor of either party. The court must determine 'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party prevail as a matter of law.'

Twin City Bank, et al. v. Verex Assurance, Inc., 733 F.Supp. 67 (E.D.Ark. 1990), citing, Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 106 S.Ct. 2505, 2512, 91 L.Ed.2d 202 (1986). "On summary judgment the plaintiff need only present sufficient evidence to raise genuine doubt as to the legitimacy of the defendant's motives." Peterson v. Scott County, 406 F.3d 515, 522 (8th Cir. 2005).

"Summary judgment should be 'cautiously invoked' so that no person will be improperly deprived of his Seventh Amendment right to a jury trial where there is no genuine issue as to any material fact." Robertson v. White, 635 F.Supp. 851, 870 (W.D. Ark. 1986). The Eighth Circuit has also held that "a judge does not sit as a trier of fact when deciding a motion for summary judgment even if the case is scheduled to be heard without a jury." Medical Institute of Minnesota v. Nalts, 817 F.2d 1310 (8th Cir. 1987).

The moving party has the burden of demonstrating that there is no genuine issue as to any material fact, and any doubt should be resolved in favor of the party resisting the motion. Ozark v. Milling Co., Inc. v. Allied Mills, Inc., 480 F.2d 1014 (8th Cir. 1973); see also, Tolan v. Cotton, 572 U.S. ___, 134 S.Ct. 1861, 1866, 188 L.Ed.2d 895 (2014); Adickes v. S. H. Kress & Co., 398 U.S. 144, 157 (1970). The courts have held that since summary judgment is such an extreme remedy, a motion for summary judgment should be granted "only if no genuine issue exists as to any material fact." Haas v. Weiner, 765 F.2d 123 (8th Cir. 1985). "In deciding whether to grant a motion for summary judgment, the district court must view the evidence in favor of the party opposing the motion and give him the benefit of all reasonable inferences." Green v. St. Louis Housing Authority, 911 F.2d 65, 68 (8th Cir. 1990); Kegal v. Runnels, 793 F.2d 924, 926 (8th Cir. 1986); Johnson v. Minnesota Historical Society, 931 F.2d 1239, 1244 (8th Cir. 1991); Canada v. Union Electric Company, 135 F.3d 1211, 1212 (8th Cir. 1997). Affidavits are not necessary to

oppose a motion for summary judgment. *See* <u>Adams d/b/a D. L. Adams Motors v. Hudspeth</u> <u>Motors, Inc.</u>, 587 S.W.2d 227 72 (Ark.App. 1979).

> Fed.R.Civ.P. 56(c) provides that summary judgment shall be entered if the 'pleadings, depositions answers to interrogatories, and admissions on file together with the affidavits, *if any*, show that there is not a genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'

<u>Green v. St. Louis Housing Authority</u>, 911 F.2d 65, 68 (8th Cir. 1990) (emphasis added).

"Summary judgment should be sparingly used and then only in those rare instances where there is no dispute of fact and where there exists only one conclusion. All the evidence must point one way and be susceptible of no reasonable inference sustaining the position of the non-moving party." <u>Holly v. Sanyo Mfg. Inc.</u>, 771 F.2d 1161, 1164 (8th Cir. 1985).

The Courts have also held that "[s]ummary judgment should seldom be granted in discrimination cases." <u>Bassett v. City of Minneapolis</u>, 211 F.2d 1097, 1099 (8th Cir. 2000), *citing Smith v. St. Louis University*, 109 F.2d 1261, 1264 (8th Cir. 1997) (Arnold, R., C.J., Beam & Alsop, JJ.); *Keathley v. Ameritech Corp.*, 187 F.3d 915, 919 (8th Cir. 1999) (Bowman, Heaney & Longstaff, JJ.); *Lynn v. Deaconess Med. Center West Campus*, 160 F.3d 484, 486 (8th Cir. 1998) (Arnold, R., Beam & Arnold, M., JJ.); *Helfer v. United Parcel Serv., Inc.*, 115 F.3d 613, 615 (8th Cir. 1997) (Loken, Arnold, M. & Gunn, JJ.); *Bialas v. Greyhound Lines, Inc.* 59 F.3d 759, 762 (8th Cir. 1995)(Beam, Gipson & Murphy, JJ.0; *Oldham v. West*, 47 F.3d 985, 988 (8th Cir. 1995) (Hanson, Gibson, F. & Will, JJ.); *Weissman v. Congregation Shaare Emeth*, 38 F.3d 1038, 1045 (8th Cir. 1994), (McMillian, Bright & Loken, JJ); *Crawford v. Runyon*, 37 F.3d 1338, 1341 (8th Cir. 1994)(Arnold, R., C. J. Wollman & Beam, JJ.); *Johnson v. Minnesota Historical Society*, 931 F.2d 1239, 1244 (8th Cir. 1991) (McMillian, Fagg & Strom, JJ.); *Hillebrand v. M-Tran Industries, Inc.*, 827 F.2d 363, 364 (8th Cir. 1987)(Lay, C. J. Heaney & Larson, JJ.). "Summary judgment

should seldom be granted in employment discrimination cases because intent is often the central issues and claims are often based on inference." Peterson v. Scott County, 406 F.3d 515, 520 (8th Cir. 2005).

The Eighth Circuit cautioned against using summary judgment in discrimination cases. "Notably, we have repeatedly emphasized that 'summary judgment should be used sparingly in the context of employment discrimination and/or retaliation cases where direct evidence of intent is often difficult or impossible to obtain.'" Torgerson v. City of Rochester, 605 F.3d 584, 593 (8th Cir. 2010), *quoting*, Wallace v. DTG Operations, Inc., 442 F.3d 1112, 11117 (8th Cir. 2006); *see also*, Peterson v. Scott County, 406 F.3d 515, 520 (8th Cir. 2005)[1]. We have also cautioned that summary judgment should not be granted in 'close' cases. '[T]he need to resolve factual issues in close cases is the very reason we have juries.' Torgerson, 605 F.3d at 594, citing, First National of Omaha v. Three Dimension Systems Products, Inc., 289 F.3d 542, 545 (8th Cir. 2002); *see also*, Keho v. Anheuser-Busch, Inc., 995 F.2d 117, 120 (8th Cir. 1993).

> [t]he court must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence. *Lytle v. Household Mfg., Inc.*, 494 U.S. 545, 554-555 (1990); *Liberty v. Lobby, Inc.*, *supra.*, at 254; *Continental Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 696, n. 6 (1962). 'Credibility determinations, the weighing of the evidence, and all the drawing of legitimate inferences from the facts are jury functions, not those of a judge.' *Liberty Lobby*, *supra*, at 255. Thus, although the court should review the record as a whole, it must disregard all evidence favorable to the moving party that the jury is not required to believe. *See Wright & Miller 299.* That is, the court should give credence to the evidence favoring the nonmovant as well as that 'evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent that evidence comes from disinterested witnesses.'

---

[1] Undersigned counsel recognizes that the Eighth Circuit, in a deeply divided opinion (6-5), indicated that "[b]ecause summary judgment is not disfavored and is designed for 'every action,' panel statements to the contrary are unauthorized and should not be followed." Torgerson, et al. v. City of Rochester, Eighth Circuit Court of Appeals, No. 09-1131 (June 1, 2011) (*en banc*) (emphasis added). It is really not clear whether the Eighth Circuit reversed all of those opinions, or just criticized them. Nevertheless, the practical effect of the "seldom be granted" language as espoused by the Eighth Circuit in *Bassett*, supra., and its progeny, in recent times has had no serious application, to benefit civil rights litigants. *See* Clermont and Swab, *Employment Discrimination Plaintiffs In Federal Court: From Bad to Worse?*, 3 Harv. L. & Pol'y Rev. 1 (Winter 2009).

<u>Reeves v. Sanderson Plumbing Products, Inc</u>., 530 U.S. 133, 120 S.Ct. 2097, 147 L.Ed.2d 105

(2000).

> Summary judgment is warranted when there remain no genuine issues of material fact
> and the movant is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). We
> review de novo the summary judgment record in light most favorable to Bell to
> determine whether or not a reasonable person could make inferences supporting
> plaintiff's claims. *See Benson v. Northwest Airlines, Inc.*, 62 F.3d 1108, 1111 (8th Cir.
> 1995). But neither the district court's function nor ours is to weigh evidence in the
> summary judgment record to determine the truth of any factual issue; we merely
> determine whether there is evidence creating a genuine issue for trial. *Anderson v.
> Liberty Lobby, Inc.*, 477 U. S. 242, 249-51 (1986). Because employment
> discrimination cases frequently turn on inferences rather than direct evidence, the court
> must be particularly deferential to the party opposing summary judgment.

<u>DeAudra Bell v. Conopco, Inc</u>., 186 F.3d 1099, 1101 (8th Cir. 1999) (emphasis added), *citing* <u>Snow</u>

<u>v. Ridgeview Medical Center</u>, 128 F.3d 1201, 1205 (8th Cir. 1997).

At the summary judgment stage, "[t]he controlling issue ordinarily is whether or not there

exists a genuine issue of fact regarding any discriminatory motive." <u>Strate v. Midwest Bankcenter,</u>

<u>Inc</u>.,398 F.3d 1011, 1017-1018 (8th Cir. 2005). The Eighth Circuit further stated that, "[w]e have

long recognized that a genuine issue of fact regarding unlawful employment discrimination may

exist notwithstanding the plaintiff's inability to directly disprove the defendant's proffered reason

for the adverse employment action." <u>Strate</u>, 398 F.3d at 1017, *citing* <u>O'Bryan v. KTIV Television</u>,

64 F.3d 1188, 1192 (8th Cir. 1995).

> [A] plaintiff bringing an employment discrimination claim may succeed in resisting a
> motion for summary judgment where the evidence, direct or circumstantial, establishes
> a genuine issue of fact regarding an unlawful motivation for the adverse employment
> action (i.e., a motivation based upon a protected characteristics), even though the
> plaintiff may not be able to create genuine doubt to the truthfulness of a different, yet
> lawful, motivation.

<u>Strate</u>, *supra*.

B.     42 U.S.C. § 1983

In that the defendant Arkansas Department of Finance and Administration (DF&A) is a state agency, the plaintiff brings this cause of action pursuant to 42 U.S.C.S. § 1983, contending that he was deprived of his federally protected rights, by persons acting under color of law.  The language of 42 U.S.C.S. § 1983 reads as follows:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

It is well established that 42 U.S.C.S. § 1983 is an enforcement for violations of a citizen's individual rights as guaranteed by the Fourteenth Amendment of the United States Constitution. A bill introduced in the House of Representatives on March 28m 1871 as H.R. 320 (which is codified as 42 U.S.C.S. § 1983), known as the Civil Rights Act of 1871, was introduced as "a bill 'to enforce the provisions of the fourteenth amendment to the Constitution of the United States, and for other purposes.'" Monell v. Department of Social Services of City of New York, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978).  "The history of the Act (Civil Rights Act of 1871) is replete with statements indicating that Congress thought it was creating a remedy as broad as the protection that the Fourteenth Amendment affords the individual." Lugar v. Edmondson Oil Co., 457 U.S. 922, 935 (1982).

"Title 42 U.S.C. § 1983 provides a remedy for deprivations of rights secured by the Constitution and laws of the United States when that deprivation takes place 'under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory . . . .'" Lugar v. Edmondson Oil Co., 457 U.S. 922 (1982).  The Court went on to noted that "it is clear that in a § 1983 action brought against a state official, the statutory requirement of action 'state action'

requirement of the Fourteenth Amendment are identical." 457 U.S. at 929. The key language in

§ 1983 for the case at bar is "custom or usage."

> [T]he touchstone of the § 1983 action against a government body is an allegation that official policy is responsible for a deprivation of rights protected by the Constitution, local governments, like every other § 1983 'person,' by the very terms of the statute, may be sued for constitutional deprivations visited pursuant to government 'custom' even though such a custom has not received formal approval through the body's official decision-making channels.

Monell v. Department of Social Services of City of New York, 436 U.S. 658, 98 S.Ct. 2018, 56

L.Ed.2d 611 (1978).

In another United States Supreme Court decision, the Court recognized that the official

policy need not be a written policy, the Court held, "[a]lthough not authorized by written law, such

practices of state officials could well be so permanent and well settled as to constitute a custom or

usage' with the force of law." Adickes v. S. H. Kress and Company, 398 U.S. 144, 90 S.Ct. 1598,

1613-1614 (1970). The Court cited a decision by Justice Frankfurther, who wrote:

> [I]t would be a narrow conception of jurisprudence to confine the notion of laws to what is found written on the statute books, and to disregard the gloss which life has written upon it. Settle state practice . . . can establish what is state law. The equal protection clause did not write an empty formalism into the Constitution. Deeply embedded traditional ways of carrying out state policy, such as those of which petitioner complains, are often tougher than the dead words in the written text. 90 S.Ct. at 1614, citing Nashville, C. & St. Louis Rail Company v. Browning, 310 U.S. 362, 60 S.Ct. 968, 84 L.Ed.2d 1254 (1940).

The Fourteenth Amendment to the United States Constitution made the bill of rights applicable to

state action. Basically, States are prohibited from abridging the privileges or immunities of its

individual citizens. In dealing with the issue of what are privileges and immunities of individual

citizens, the United States Supreme Court cited an opinion by Mr. Justice Washington of the

Circuit Court for the District of Pennsylvania enunciated in the case of Corfield v. Coryell. Mr.

Justice Washington noted that the privileges and immunities of citizens are fundamental rights.

Justice Washington wrote that "'[w]hat these fundamental principles are, it would be more tedious that difficult to enumerate. They may all, however, be comprehended under the following general heads: protection by the government, with the right to acquire and possess property of every kind, and to pursue and obtain happiness and safety, subject, nevertheless, to such restraints as the government may prescribe for the general good of the whole.'" Slaughter-House Cases, 16 Wall. 36, 21 L.Ed. 394 (1873). Also, the Fourteenth Amendment guarantees citizens of the United States equal protection of the laws.

In the case at bar, the plaintiff contends that she was discriminated against based on her race, when she was not promoted to the SE02 pay grade like her white contemporaries. The plaintiff also contends that she was retaliated against for having complained about discriminatory treatment. The defendant is a state actor, and it has deprived the plaintiff of her federally protected rights of not being subjected to discrimination based on race.

    C.    <u>Title VII of the Civil Rights Act</u>

The Civil Rights Act of 1964 (as amended), which is codified at 42 U.S.C.S. § 2000e−2, makes it unlawful to discriminate against a person in the employment context. The law states:

It shall be an unlawful employment practice for an employer−

(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin; (2) to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national status.

"The language to Title VII makes plain the purpose of Congress to assure equality of employment opportunities and to eliminate those discriminatory practices and devices which have

fostered racially stratified job environments to the disadvantage of minority citizens." McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668, 676 (1973), *citing*, Griggs v. Duke Power Co., 401 U.S. 424, 429, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971); Castro v. Beecher, 459 F.2d 725 (1st Cir. 1972); Chance v. Board of Examiners, 458 F.2d 1167 (2nd Cir. 1972); Quarles v. Phillip Morris, Inc., 279 F.Supp. 505 (E.D. Va. 1968).

Prima Facie Case

The plaintiff in a Title VII case has the initial burden of establishing a *prima facie* case of racial discrimination. "The plaintiff must prove by a preponderance of the evidence that she applied for an available position for which she was qualified, but was rejected under circumstances which give rise to an inference of unlawful discrimination." Texas Department of Community Affairs v. Burdine, 450 U.S. 248, 253, 101 S.Ct. 1089, 67 L.Ed.2d 207, 215 (1981). A *prima facie* case of racial discrimination is demonstrated if the plaintiffs show the following:

(i)     that they belong to a racial minority;

(ii)    that they applied and were qualified for a job which the employer was seeking applicants;

(iii)   that, despite their qualifications, they were rejected; and

(iv)    that, after their rejection, the positions remained opened and the employer continued to seek applicants from persons of complainant's qualifications.

McDonnell Douglas Corp. v. Green, 36 L.Ed.2d at 677.

"The threshold of proof necessary to make a *prima facie* case is minimal . . . ." Johnson v. Arkansas State Police, 10 F.3d 547 (8th Cir. 1993), *citing* Saint Mary's Honor Center v. Hicks, 509 U.S. 502, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993).

The *McDonnell Douglas–Burdine* burden-shifting framework was created because only rarely will a plaintiff have direct evidence of discrimination. Gone are the days

(if, indeed, they ever existed) when an employer would admit to firing an employee because she is a woman, over forty years of age, disable or a member of certain race or religion. To allow those genuinely victimized by discrimination a fair opportunity to prevail, courts will presume that, once the plaintiff has shown the above elements, unlawful discrimination was the most likely reason for the adverse personnel action. The elements of that prima facie case, however, must not be applied woodenly, but must rather be tailored flexibly to fit the circumstances of each type of illegal discrimination.

Geraci v. Moody−Tottrup, International, Inc., 82 F.3d 578, 581 (3rd Cir. 1996), *citing* McDonnell Douglas, 411 U.S. at 802, n. 13, 93 S.Ct. at 1824 n. 13; Torres v. Casio, Inc., 42 F.3d 825, 830 (3rd Cir. 1994).

"The threshold of proof necessary to make a prima facie case is minimal . . ." Johnson v. Arkansas State Police, 10 F.3d 547 (8th Cir. 1993), *citing* Saint Mary's Honor Center v. Hicks, 509 U. S. ____, 125 L.Ed.2d 407, 113 S.Ct. ___ (1993).

In the promotion context, Favors can establish a prima facie case of prohibited racial discrimination by showing (1) she belongs to a racial minority, (2) she applied and was qualified for a job for which GSA was seeking applicants, (3) despite her qualifications, she was rejected, and (4) after her rejection, GSA filled or sought to fill the position with persons of Favor's qualifications.

Favors v. Fisher, 13 F.3d 1235, 1237 (8th Cir. 1994).

Sovereign Immunity

The defendant argues that the plaintiff's claims are barred by sovereign immunity. This is an issue that has been put to bed a long time ago. On the issue of sovereign immunity as it relates to claims of sex and race discrimination, the United States Supreme Court has already held that Congress abrogated the state's Eleventh immunity claims with respect to these claims. *See* Fitzpatrick v. Bitzer, 427 U.S. 445, 96 S.Ct. 2666, 49 L.Ed.2d 614 (1976). The Eighth Circuit followed the opinion in *Fitzpatrick* in the cases of Winbush v. Iowa, 66 F.3d 1471, 1483 (8th Cir. 1995), and Greenwood v. Ross, 778 F.2d 448, 452-453 (8th Cir. 1985). The State of Arkansas

asked the Eighth Circuit to reconsider its position in the case of <u>Okruhlik v. University of Arkansas ex rel. May</u>, 255 F.3d 615 (8th Cir. 2001).

"[O]ur study would lead us to conclude that Congress unmistakably expressed its intent in the 1972 Act to subject states to suits under Title VII.  In its amendment to the Act in 1972 Congress expanded the definition of employer to include 'governments, governmental agencies, [and] political subdivisions . . . .'" 42 U.S.C. § 2000e(a). . . . Read as a whole, the plain language of these provisions demonstrates Congress' intent to abrogate Eleventh Amendment immunity of the states in this area."  <u>Okruhlik v. University of Arkansas ex rel. May</u>, 255 F.3d 615, 622-623 (8th Cir. 2001).

The Court in *Okruhlik* also held that the 1991 Act made compensatory damages available to plaintiffs against the state in Title VII cases.  *Okruhlik*, supra., 255 F.3d at 623.  However, a plaintiff cannot get punitive damages against the state.  255 F.3d at 623.

"Section 5 of the Fourteenth Amendment is a grant of legislative power which Congress exercised in enacting Title VII."  <u>Okruhlik v. University of Arkansas ex rel. May</u>, 255 F.3d 615, 624 (8th Cir. 2001)[2], citing, <u>Fitzpatrick v. Bitzer</u>, 427 U.S. 445, 453, 96 S.Ct. 2666, 49 L.Ed.2d 614 (1976).  The court held that since Congress had identified "a history and pattern of unconstitutional employment discrimination by the states [on the basis of race and gender], then its act in abrogating the states' Eleventh Amendment immunity was valid.  *Okruhlik*, supra., 255 F.3d at 624.  The report released by the U. S. Commission on Civil Rights in 1969, clearly established a pattern and practice of race and sex discrimination among the states.  *Okruhlik*, supra., 255 F.3d at 624. "Appropriate legislation under Section 5 must be prophylactic or remedial rather than a

---

[2] Undersigned counsel had the companion case of <u>Dorothy Robinson, et al. v. The Board of Trustees of the University of Arkansas</u>.

congressional formulation of what it views as a constitutional violation." *Okruhlik*, supra., 255 F.3d at 625.

Congress made compensatory damages a possible remedy for intentional discrimination. Based on the widespread pattern of state discrimination Congress identified, and giving the legislative branch the "widespread latitude" it is afforded in drawing an appropriate remedy, see City of Boerne, 521 U.S. at 520,[1] 117 S.Ct. 2157, compensatory damages are proportional and congruent." *Okruhlik*, supra., 255 F.3d at 626.

Therefore, the defendant's sovereign immunity claim must fail.

SE02 Pay Grade

The plaintiff contends that she was subjected to disparate treatment on account of her race when she was not placed at the SE02 pay grade, while her white counterparts were. The plaintiff and others knew that there had been a compensation study conducted, and that a new pay plan was on the way. In late December 2016, a meeting took place with management services for the purpose of discussing a new electronic system – EASE. All of the administrators were required to attend the meeting, but Ms. Smith could not attend due to other more pressing commitments dealing with federal grants. Apparently after the meeting had almost ended, it was mentioned by management officials that the pay plan had been completed, and that all of the administrators were being placed at the SE-02 (Senior Executive) pay level, while Mr. Quattlebaum and Ms. Smith would be placed at the GS-15 pay level. (**Smith's depo., p. 20, 23**).

When Ms. Smith saw SB289 in early February, she went to speak with Kay Barnhill about the matter. Ms. Smith saw that this bill was placing her at the GS-15 pay level, as she had been told earlier by Ricky Quattlebaum. Ms. Smith saw that all of the other administrators had been

---

[1] City of Boerne v. Flores, 521 U.S. 507, 117 S.Ct. 2157, 138 L.Ed.2d 624 (1997).

placed at the SE02 pay level. Ms. Smith noticed that all of the administrators previously at the N909 and N907 had been placed at the SE02 pay level, and that she was the only administrator in Management Services who was being placed at the GS-15 pay level. (**Smith's depo., p. 24**). Although Ricky Quattlebaum told Ms. Smith that they were both being placed at the GS-15 pay level, she noticed that Mr. Quattlebaum, previously at the N907 pay level, was going to the SE02 pay level, with other administrators, all of whom were Caucasian. (**Smith's depo., p. 24**). Although Ricky Quattlebaum was slated to be a GS-15, he had conversations with Paul Louthian, requesting to be moved to the SE02 pay grade, which Louthian honored. (**Smith's depo., p. 95-96**). Prior to January 2017, Mr. Quattlebaum was below the plaintiff on the pay scale, but after July 1, 2017, he was above her on the pay scale.

Ms. Smith attempted to get answers to why she was being placed on a GS15 pay plan, while her white contemporaries were being placed at the SE02 pay scale. However, when Ms. Smith was unable to get answers she contacted the EEOC on February 10, 2017. (**Smith's depo., p. 29**). The EEOC notified the Department of Finance and Administration on February 16, 2017. This notice was sent to Amy Valentine of Human Services for DF&A. (**See Plaintiff's Exhibit "F"**). Shortly after getting the Notice of Charge filing by Doris Smith, SB289 was amended on February 21, 2017, to place Ms. Smith's position at the SE02 pay grade. (**See Plaintiff's Exhibit "E-2"**). However, Ms. Smith did not find out that the amended bill was placing her position in the SE02 pay grade until July 7, 2017. (**Smith's depo., p. 28**).

"Disparate treatment arises when an employer simply treats some people less favorably than others because of their race, color, religion, sex, or national origin. . . ." Bonilla v. Oakland Scavenger Co., 31 FEP Cases 50, 53 (9th Cir. 1983), *quoting*, International Brotherhood of Teamsters v. United States, 431 U.S. 324, 335-36 n. 15, 14 FEP Cases 1514 (1977).

In a race discrimination case, a plaintiff may survive a defendant's motion for summary judgment in one of two ways. The plaintiff may present admissible evidence directly indicating unlawful discrimination, that is, evidence showing a specific link between the alleged discriminatory animus and the challenged decision, sufficient to support a finding by a reasonable fact finder that an illegitimate criterion actually motivated the adverse employment action. *Russell v. City of Kan. City, Mo*., 414 F.3d 863, 866 (8th Cir. 2005). Alternatively, if the plaintiff lacks such evidence of discrimination, she may survive the defendant's motion for summary judgment by creating an inference of unlawful discrimination under the burden-shifting framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-04, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973).

Fields v. Shelter Mutual Insurance Co., 520 F.3d 859, 863-864 (8th Cir. 2008).

"Instances of disparate treatment can support a claim of pretext, but Lynn has the burden of proving that he and the disparately treated female nurses were 'similarly situated in all relevant respects.'"

Lynn v. Deaconess Medical Center-West Campus, 160 F.3d 484, 487 (8th Cir. 1998). "To be probative of pretext, the alleged misconduct of other employees must be of 'comparable seriousness.'" Elam v. Regions Financial Corporation, 601 F.3d 873, 881 (8th Cir. 2010).

Despite the fact that SB289 authorized the DF&A to place Ms. Smith in the SE02 pay grade, the agency placed Ms. Smith in the SE01 pay grade. Ms. Smith found out that she was being placed in the SE01 pay grade on July 7, 2017. Ms. Smith found out that her white counterparts were being placed in the higher pay grade of SE02. Although Mr. Quattlebaum told Ms. Smith that he was being placed in the GS15 pay grade just as Ms. Smith, he was later placed in the SE02 pay grade, after talking to Mr. Louthian. (**Smith's depo., p. 24**). In the defendant's responses to the *Plaintiff's First Set of Interrogatories and Requests for Production of Documents*, the plaintiff requested that the defendant lists the name of each person who held the position of administrator in the defendant's Division of Management Services as of July 1, 2017, who was reclassified to the pay grade of SE02. The defendant listed the following individuals: a) Edward Armstrong, b) Duncan Baird, c) Kay Barnhill, d) Chris Howlett, e) Ricky Quattlebaum, and f)

Kenneth Williams. All of these individuals are Caucasian, and all were promoted to the SE02 position with a salary of $120,543.00. (**See Defendant's Responses to Plaintiff's First Set of Interrogatories and Requests for Production of Documents attached herein as Plaintiff's Exhibit "J"**).

The defendant makes the argument that the above-mentioned comparators are not similarly situated because some of them have larger budgets than the plaintiff, or some of them may have larger staffs that they supervised. Mr. Louthian testified that he had a "casual" conversation with Kay Barnhill about where Doris Smith and Ricky Quattlebaum should fall on the pay scale, recommending that they both should be at the GS-15 pay grade. (**Louthian's depo., pp. 27-28**). Mr.Louthian stated that he did not review any documents, make any writings, nor has he ever seen this pay plan study. (**Louthian's depo., p. 40**). Although Louthian recommended that Quattlebuam should have been at the GS-15 pay scale, he ended up being placed at the SE02 pay grade, making $120,543.00 per year, while the plaintiff was at the SE01 position, making $108,100.00 per year. The SE02s made $12,443.00 more per year than Ms. Smith.

The defendant tries to justify the higher pay scale for the white administrators by attempting to elevate their responsibilities. For instance, the defendant contends that Duncan Baird is the Administrator of the Office of Budget, and therefore he controls the entire state budget of $30 billion, which is certainly not the case. The defendant mentions Chris Howlett, Administrator for Employee benefits, who is over the health insurance policies for 28,000 employees. In essence, the defendant is contending that Mr. Howlett has supervisory responsibility for 28,000 employees, which is certainly not the case. The defendant makes a similar argument for Kay Barnhill, Administrator for the Office of Personnel Management, as somehow having supervisory responsibility for 28,000 employees, again, which is not the case, and states that she is responsible

for a payroll of $2 billion.  The defendant knows that each administrator has its own budget for their offices, which is certainly not even close to $2 billion.  It is interesting to note that prior to July 1, 2017, they were all Administrators N909, just like the plaintiff was.

Mr. Louthian has a pattern of trying to devalue the worth of African-Americans.  Mr. Louthian had a problem with an African-American female by the name of Marilyn Graham.  Doris Smith, prior to Mr. Louthian becoming the deputy director, had hired Ms. Graham and designated her as "exceptional qualified," in order to justify paying her a higher salary.  (**Louthian's depo, pp. 78-79**).  Mr. Louthian also placed a low value on the worth of Ms. Smith, wanting her to be placed in the GS15 pay grade, and not agreeing that she should be placed at the SE01 pay grade. (**Louthian's depo., p. 44**).  When the employer offers unfounded reasons for the adverse employment action, the trier of fact may infer "an improper motive from evidence of the falseness of an employment proffered justification for an adverse action."  Paul Hudson v. Larry Norris, et al., 227 F.3d 1047, 1051 (8th Cir. 2000), *citing*, Reeves v. Sanderson Plumbing Products, Inc., 120 S.Ct. 2097, 2108 (2000); Campbell v. Arkansas Department of Correction, 155 F.3d 950, 958 (8th Cir. 1998).

The defendant contends that the plaintiff's comparators are not similarly situated.  "The 'similarly situated co-worker inquiry is a search for a substantially similarly employee, not for a clone.'"  Ridout v. JBS USA, LLC, 715 F.3d 1079, 1085 (8th Cir. 2013), *quoting*, Chaney v. Plainfield Healthcare Ctr., 612 F.3d 908, 916 (7th Cir. 2010).

> While no employee is a precise clone of another, *see Chaney*, 612 F.3d at 916, the probative value of comparator evidence will be greatest when the circumstances faced by the putative comparator are most similar to the plaintiff's.  Where evidence demonstrates that a comparator engaged in acts of 'comparable seriousness' but was disciplined differently, a factfinder may decide whether the differential treatment is attributable to discrimination or some other cause.' *See Lynn*, 160 F.3d at 489.

<u>Rideout v. JBS USA, LLC</u>, 715 F.3d 1079, 1085 (8th Cir. 2013).

The case at bar is similar to another case handled by undersigned counsel – <u>Melvin Smith v. URS</u>, 803 F.3d 964 (8th Cir. 2015).  Melvin Smith, who is African-American complained that he was the victim of discrimination based on race when a white male Jesse Griffin, who was hired a few months after Mr. Smith, was placed at a higher pay grade, thus paid more.  Mr. Smith was a S5.12 Training Specialist, and was paid $57,668.00 per year, while Jess Griffin, was hired a few months later, supposedly for the same position, but was placed in a higher paying S5.13 Training Specialist position, making $65,000.00 per year.  A few months after Mr. Griffin was hired, an African-American by the name of Stanley Eillis, who possessed a master's degree, and was close to finishing up his doctorate, which he did, was hired in the same position as Melvin Smith, at the SE-12 Training Specialist position, also paid $57,668.00 per year. The trial court granted the defendant's motion for summary judgment, and Smith appealed.  The Eighth Circuit reversed.

> We have described the elements of a prima facie case in the specific context of a § 1981 disparate treatment claim based on allegedly discriminatory pay differentials:
>
>> To meet her burden, a plaintiff must show the following: (1) that she is a member of a protected class; (2) that she was meeting her employer's legitimate job expectations; (3) that she suffered an adverse employment action; and (4) that similarly situated employees outside the protected class were treated differently.
>
> <u>Fields v. Shelter Mut. Ins., Co.</u>, 520 F.3d 859, 864 (8th Cir. 2008)[3]; *see also* <u>Lake v. Yellow Transp., Inc.</u>, 596 F.3d 871, 874 (8th Cir. 2010).

<u>Melvin Smith v. URS Corporation</u>, 803 F.3d 964, 968-969 (8th Cir. 2015).

Just as in the case at bar, the appellate court noted that this is not a failure-to-hire case.  This is a case involving disparate treatment in terms and conditions of employment.

---

[3] Case also prosecuted by undersigned counsel.

In the case at bar, the plaintiff has presented evidence that she was the only person who was placed in a SE01 pay grade, while her white contemporaries were placed in the higher paying SE02 pay grade. The plaintiff was placed in the SE01 pay grade, despite the fact that SB289 had authorized her position to be placed in the SE02 pay grade. The plaintiff was paid a salary of $108,100.00, while her white counterparts were placed in the SE02 paygrade, with an annual salary of $120,543.00. (**See Statement of Undisputed Fact No. 20**). Although Ricky Quattlebaum was initially supposed to have been placed in the GS15 pay grade as the plaintiff, he was later placed on the SE02 pay grade, after speaking with Louthian. (**See Statement of Undisputed Fact No. 8**). With the exception of Quattlebaum, who was a N907 before the pay scale restructuring, the plaintiff's white counterparts were all N909s, just like Doris Smith.

It is interesting to note that after Ms. Smith had contacted the EEOC on February 10, 2017, and the EEOC sending DF&A notice of this filing on February 16, 2017, Paul Louthian initiates a conversation with Ed Armstrong about changing his race designation from "White/Not Hispanic" to "White and Hispanic." Mr. Louthian had a conversation with Mr. Armstrong about his race designation about three (3) months after the plaintiff's EEOC filing. (**Louthian's depo., p. 25**) (**See Plaintiff's Exhibit "K-1" and "K-2" 1226/1258**).

The defendant makes the argument that there were white employees who were also placed at the SE01 position like the plaintiff was. However, these individuals identified by the defendant did not work in management services, where the plaintiff worked. In *Statement of Undisputed Fact No. 18*, the defendant identifies the following individuals: John Shelnutt, Melanie Hazeslip, Vicki Mills, Joel DiPippa, Lynne Reynolds, Tonie Shields, Deanna Munds-Smith, Wayne Hamric, Amanda Endsley, who are all Caucasian, but who were placed in the SE01 pay grade. However, with the exception of John Shelnutt, who had already announced his retirement, the other

individuals do not work in management services; they worked in the Division of Revenue. (**See Plaintiff's Exhibit "D" – Organizational Chart -12-13-2016**). Therefore, they are not comparators. A comparator must be "similarly situated in all relevant respects," and "the relevant respects are the conduct of the employees and any disparity in their discipline." Chappell v. Bilco Co., 675 F.3d 1110, 1119 (8th Cir. 2012). The employees "used for comparison must have dealt with the same supervisor, have been subject to the same standards, and engaged in the same conduct without any mitigating or distinguishing circumstances." Muor, 716 F.3d 1072, 1078 (8th Cir. 2013) (*citing* Wierman v. Casey's Gen. Stores, 638 F.3d 984, 994 (8th Cir. 2011) (*quoting* Cherry v. Ritenour Sch. Dist., 361 F.3d 474, 479 (8th Cir. 2004).

Retaliation

The plaintiff contacted the EEOC on February 10, 2017, after she was not able to get answers to her questions as to why she was being placed at the GS-15 pay grade. The EEOC sent a notice on February 16, 2017 to DF&A advising the agency that Ms. Smith had filed a Charge of Discrimination with the EEOC. Mr. Louthian was aware of the plaintiff's EEOC filing. (**Louthian's depo., p. 24**). The plaintiff filed her official charge of discrimination with the EEOC on March 21, 2017, contending that she was the victim of racial discrimination when she was not classified to the position of SE02. (**See Plaintiff's Exhibit "L-1"**). On October 31, 2017, the plaintiff filed a second charge of discrimination with the EEOC, contending that she was the victim of retaliation and that the discrimination was a continuing action of her original charge of discrimination, when she was denied the upgrade to the SE02 position, despite the fact that her employer had legislative approval for the upgrade. (**See Plaintiff's Exhibit "L-2"**). Then on July 24, 2018, the plaintiff filed her third charge of discrimination with the EEOC contending that she was the victim of discrimination based on race and retaliation when she was terminated from her

place of employment with defendant on the date of April 3, 2018.  (**See Plaintiff's Exhibit "L-3"**).    On March 20, 2018, the EEOC issued its "Dismissal and Notice of Rights" letter to the plaintiff's second Charge of Discrimination that she filed on October 31, 2017; this letter was mailed to Amy Valentine of DF&A – Human Resources.  (**See Plaintiff's Exhibit "L-4"**).  The plaintiff was terminated 153 days after filing her second charge of discrimination with the EEOC and 14 days after the EEOC issues her second right-to-sue letter.

The plaintiff contends that her complaining about discrimination led to her termination.  (**Smith's depo., p. 101**).  "In our view, a plaintiff must show that a reasonable employee would have found the challenged action materially adverse, 'which in this context means it well might have 'dissuaded a reasonable worker from making or supporting a charge of discrimination.'" Burlington Northern & Santa Fe Railway Co. v. White, No. 05-259, 2006 WL 1698953, at \*11 (U. S. Supreme Ct., June 22, 2006), *citing* Rochon v. Gonzales, 438 F.3d 1211, 1213 (C.A.D.C. 2006), *quoting*, Washington v. Illinois Dept. of Revenue, 420 F.3d 658, 662 (7th Cir. 2005).

"To establish a prima facie case of retaliation under Title VII, a plaintiff must show: (1) that she engaged in protected activity; (2) that adverse employment action occurred; and (3) a causal connection between the two."  Kobrin v. University of Minnesota, 34 F.3d 698, 704 (8th Cir. 1994), *citing*, Jackson v. Missouri Pac. R.R., 803 F.2d 401, 406-07 (8th Cir. 1986) and Womack v. Munson, 619 F.2d 1292, 1296 (8th Cir. 1980), *cert. denied*, 450 U.S. 979, 101 S.Ct. 1513, 67 L.Ed.2d 814 (1981).  The employer must then articulate a legitimate, nondiscriminatory reason for the adverse action, then the employee must be given an opportunity to show that the proffered reason was pretextual, and that their protected activity was the true reason. *See* Smith v. Riceland Foods, Inc., 151 F.3d 813, 818 (8th Cir. 1998).  "This court has recognized the established rule that `an act in retaliation for the exercise of a constitutionally protected right is actionable

under Section 1983 even if the act, when taken for a different reason, would have been proper.'"

Madewell v. Roberts, 909 F.2d 1203, 1206 (8th Cir. 1990). "We emphasize that the alleged manifestations of defendants' retaliation (such as less favorable treatment) need not themselves amount to constitutional violations. The violation lies in the **intent** to impede access to the courts."

Madewell v. Roberts, 909 F.2d 1203, 1206-1207 (8th Cir. 1990), *citing* Sanders v. St. Louis County, 724 F.2d 665, 666 (8th Cir. 1983).

> To establish a prima facie case of retaliation, a plaintiff must show, among other things, that she suffered an adverse employment action at the hands of her employer. *See Montando v. Farmland Industry, Inc.*, 116 F.3d 355, 359 (8th Cir. 1997). An adverse employment action is a tangible change in working conditions that produces a material employment disadvantage. *See Cossette v. Minn. Power & Light*, 188 F.3d 964, 972 (8th Cir. 1999). Termination, reduction in pay or benefits, and changes in employment that significantly affect an employee's future career prospects meet this standard, *see Kerns v. Capital Graphics, Inc.*, 178 F.3d 1011, 1016 (8th Cir. 1999), but minor changes in working conditions that merely inconvenience an employee or alter an employee's work responsibilities do not, *see Ledergerber v. Stangler*, 122 F.3d 1142, 1144 (8th Cir. 1997).

Spears v. Missouri Department of Corrections and Human Resources, 210 F.3d 850, 853 (8th Cir. April 28, 2000).

The plaintiff was subjected to a pattern of retaliatory conduct after having complained about discriminatory treatment, and contacting the EEOC on February 10, 2017, which notified the defendant on February 16, 2017 of the plaintiff's complaint of discrimination. After filing her charge of discrimination with the EEOC, the following acts of retaliation occurred:

- refusal to place Ms. Smith in the SE02 pay grade, when her white counter-parts were placed in the SE02 position – July 2017;

- removing the plaintiff from the STOP grant team in February 2018 and treating her white subordinate – Autumn Hemphill as the administrator (**Smith's depo., p. 113**);

- publicly blaming the plaintiff in front of the advisory board, stating that it was her fault that the STOP grant did not get approved – March 13, 2018 (**Smith's depo., p. 111**);

- blocking the plaintiff from hiring qualified candidates in order to fill vacancies in her office. One such case involved Angela Davis, an African-American female who was eligible for rehire – March 2018 (**Smith's depo., pp. 103-105**);

- terminating the plaintiff's employment on April 3, 2018, allegedly for the inability of getting the STOP grant approved, when the defendant knew that when the grant application was initially sent to OVW, the plaintiff was on approved vacation.

Again, the plaintiff was terminated just fourteen (14) days after the defendant was mailed a copy of the second right-to-sue letter. "An inference of a causal connection between a charge of discrimination and termination can be drawn from the timing of the two events, *Riceland*, 151 F.3d at 819-20; *Smith v. St. Louis University*, 109 F.3d 1261, 1266 (8th Cir. 1997), but in general more than a temporal connection is required to present a genuine factual issue on retaliation, *Kiel v. Select Artificials, Inc*., 169 F.3d 1131, 1136 (8th Cir. 1999) (*en banc*)." Peterson v. Scott County, et al., 406 F.3d 515, 524 (8th Cir. 2005). The Eighth Circuit also said, "[b]ut this much is clear: temporal proximity rises in significance the closer the adverse activity occurs to the protected activity. The further in proximity the decision to terminate is from the protected activity, the less suspect the decision to terminate becomes." E.E.O.C. v. Kohler Co., 335 F.3d 766, 774 (8th Cir. 2003).

The defendant terminated the plaintiff when it knew that she did not have direct responsibility for submitting the STOP grant application. The STOP grant application was submitted to OVW when the plaintiff was on vacation traveling to Italy. Like many other

administrators, including Paul Louthian, the plaintiff delegated duties to her subordinates. Debbie Bousquet was the person directly responsible for submitting the STOP grant application, and Autumn Hemphill, as the Assistant Administrator oversaw her work, or at least was supposed to. For her work, Autumn Hemphill receives a promotion and a pay increase from a GS-12 to GS-13. (**Louthian's depo., pp. 76-77**). Debbie Bousquet was the point person for the STOP grant application. (**Louthian's depo., p. 50**). Even when there was communication about the STOP grant during September 2017, between Hemphill and Bousquet, with Omar Mohammed and Mary Seighman, Doris Smith was not included in the email chain. (**Louthian's depo., pp. 54-55**).

The defendant has established a disturbing pattern and practice of terminating African-American employees who complain about race discrimination. The plaintiff submitted the following interrogatory request to the defendant:

**<u>INTERROGATORY NO. 15</u>**: Please provide the name of each employee, who after having filed a complaint of discrimination, with any federal agency of the United States of America, within the past seven (7) years, was later terminated from their place of employment with the defendant. For each person so identified, please provide the following:

a) the date that said complaint of discrimination was filed;

b) the date that said employee was terminated; and

c) the reason listed for the employee's termination.

In response to this discovery request, the defendant provided the following information:

The following chart contains those employees who alleged race discrimination, *inter alia*:

| Name | Date Filed | Reason | Termination Date | Reason |
|------|-----------|--------|-----------------|--------|
| Ethel Whitaker | 05/10/2011 | Race | June 22, 2017 | Tax Issue |

| | | | | |
|---|---|---|---|---|
| Amanda Scott | 08/31/2011 | Race | July 7, 2012 | Resigned |
| Sandra Banks | 04/12/2012 | Race | April 11, 2012 | |
| Keneshia Davis | 11/05/2012 | Race | 10/05/2013 | |
| Rosetta Giddens | 03/15/2012 | Race | 08/15/2013 | |
| Sheronica Ervin* | 03/06/2013 | Race | 01/29/2013 | |
| Rosetta Giddens | 11/05/2013 | Race | 08/15/2013 | |
| Helen Norwood* | 10/24/2013 | Race | 08/03/2013 | |
| Tamara Meadows* | 05/15/2013 | Race | 05/06/2013 | |
| Joyce Parchman* | 12/10/2015 | Race | 11/19/2015 | |
| Katrina Martin | 08/16/2016 | Race | Still employed | |
| Dujuan Pigee* | 10/12/2016 | Race | 10/09/2016 | |
| Doris Smith | 03/21/2017 | Race | 04/04/2018 | |
| Ethel Whitaker | 01/19/2017 | Race | 06/22/2017 | |
| Vanesla Williams | 12/19/2017 | Race | Still employed | |
| Doris Smith | 10/31/2017 | Race | 04/04/2018 | |
| | | | | |
| | | | | |

**\*Discharge formed the basis of the EEOC Charge**.

**Note**:   There were seven out of nine African-Americans who filed complaints alleging race discrimination, and they were terminated *after* filing their complaint – **termination rate = 77.7%**

The following employees filed EEOC Charges of Discrimination based on other than race:

| Name | Date Filed | Reason | Termination Date | Reason |
|---|---|---|---|---|
| Diane Taylor | 05/18/2011 | Retaliation | 11/09/2011 | |
| Carla Chase* | 09/24/2012 | Sex | | |
| Michael Hall | 07/12/2012 | Religion | Still Employed | |
| Sherry Richmond | 05/31/2012 | Age | Still Employed | |
| Salina Bass | 01/09/2012 | Sex/Age | Still Employed | |
| Mary McGill | 10/27/2013 | Age | Still Employed | |
| Gayle Zimmerman | 08/26/2013 | Sex/Age | Still Employed | |
| Larry Giffin* | 01/23/2013 | Disability | | |
| Tiffany Marshall* | 04/08/2013 | Disability | | |
| Khrysanthia Banks | 11/26/2014 | Sex/Retal | Still Employed | |
| William Downing | 06/11/2014 | Disability | Still Employed | |
| Alice Wallace* | 10/13/2015 | Age | | |
| Tyson Spradlin* | 04/24/2015 | Sex | | |
| Tisha Maxwell | 04/14/2016 | Retal | Still employed | |
| Kristen Shepherd | 08/17/2016 | Disability | Still employed | |
| Christine Deevers* | 04/24/2017 | Disability | | |
| Aaron Farmer | 11/07/2017 | Disability | Still Employed | |
| Nykoyah Jackson* | 07/22/2017 | Sex | | |
| Amanda Seal | 08/07/2017 | Withdrew | Still Employed | |
| Ethel Whitaker | 06/27/2017 | Retal | | |
| Yvonne Williams* | 04/01/2017 | Disability | | |
| Felicia Wright | 03/27/2017 | Sex | Still Employed | |

| | | | | |
|---|---|---|---|---|
| Mariah Grant* | 03/01/2018 | Disability | | |
| Richard Ellington* | 11/19/2018 | Age/ADA | | |
| Shabreka Caruthers* | 03/18/2018 | Age/ADA | | |
| | | | | |
| | | | | |

**\*Discharge form the basis of the EEOC Charge.**

**Note**:  Out of the thirteen (13) employees who filed EEOC Charges based on sex, religion, age, or retaliation, *only one* was terminated *after* filing their complaint – **termination rate = 7.6%**.

The above data demonstrates that if you are an African-American, and you file a Charge of Discrimination with the EEOC based on race, there is a 77.7% chance of having your employment terminated with the DF&A.  However, if you file a Charge of Discrimination with the EEOC based on something other than race, you only have a 7.6% chance of having your employment terminated with the DF&A. Of all the places that retaliation should not occur is a state and federal agency.  "In cases concerning racial discrimination, 'statistics often tell much and the Courts listen." Parham v. Southwestern Bell Telephone, 433 F.2d 421, 426 (8th Cir. 1970), *citing*, State of Alabama v. United States, 304 F.2d 583, 586 (5th Cir.), *aff'd per curiam*, 371 U.S. 37, 83 S.Ct. 145, 9 L.Ed.2d 112 (1962).

The defendant used as a basis for terminating the plaintiff the STOP grant.  The defendant knew that the plaintiff was not directly responsible for submitting the STOP grant to the OVW. Those persons responsible for submitting the grant was Debbie Bousquet and Autumn Hemphill. Although Ms. Bousquet, who is African-American, was not terminated, she was in fact removed from the grant team by Paul Louthian.  (**Smith's depo., pp. 84-85**).  Ms. Bousquet was not

terminated, mainly because she did not file a charge of discrimination with the EEOC alleging race discrimination.  (**Smith's depo., p. 101**).

Prior to the plaintiff complaining about discrimination, she was valued as an employee. Throughout Ms. Smith's employment with DF&A, she has always performed her job in a manner that "exceeds standards."  Ms. Smith became employed by DF&A in April 2004.  She was hired in the Internal Auditor's position, and was classified as "exceptionally well qualified" applicant. Ms. Smith was then promoted to the grants administrator's supervisor's position.  Then Ms. Smith was promoted to the program support manager's position, and then was promoted to the assistant administrator's position.  Lastly, she was promoted to the position of Administrator of the Office of Intergovernmental Services.  (**Smith's depo., p. 8**).

Throughout the plaintiff's tenure with the DF&A, she has received the highest performance ratings – "exceeds standards."  Ms. Smith has never been written up, nor has she ever had any discussions with anyone regarding any issues surrounding her performance. (**Smith's depo., p. 93**).  Prior to Ms. Louthian becoming the Deputy Director, he was the Administrator of the Office of Accounting. (**Smith's depo., pp. 7-8**).  Timothy Leathers was the Deputy Director, and had supervisory authority over Ms. Smith, prior to Mr. Louthian. (**Louthian's depo., p. 11**).

During her tenure under Mr. Leathers, Ms. Smith received performance evaluations for her position as Administrator of IGS/State Technology.  The following rating criteria were used to rate Ms. Smith's performance: 1) Job Knowledge, 2) Accountability, 3) Leadership, 4) Decision-Making Skills, 5) Teamwork, 6) Adaptability, 7) Quality of Work, and 8) Code of Conduct. During 2012, in each of these categories, Ms. Smith's performance rating was "exceeds standards." For her 2012 Performance Rating, Ms. Smith received an "exceeds standards," for her overall performance rating. (**See Plaintiff's Exhibit "M-1"**) (**Louthian's depo., p. 11**).    Ms. Smith

received the same performance rating for 2013. (**See Plaintiff's Exhibit "M-2"**) (**Louthian's depo., p. 12**). Ms. Smith also received an overall performance rating of "exceeds standards" for 2015. (**See Plaintiff's Exhibit "M-3"**) (**Louthian's depo., p. 12**). Also, for her performance rating period of 2016, Ms. Smith received an overall rating of "exceeds standards." (**See Plaintiff's Exhibit "M-4"**) (**Louthian's depo., pp. 12-13**).

> While 'it is possible for strong evidence of a prima facie case to also present a factual issue on pretext,' *Kiel v. Select Artificials, Inc.*, 169 F.3d 1131, 1135 (8th Cir. 1999) (en banc), that is particularly true when the alleged nondiscriminatory reason is inferior performance since that 'is simply the negative of one of the elements of the prima facie case.' *Erickson v. Farmland Indus., Inc.*, 271 F.3d 718, 726 (8th Cir. 2001). In other words, a strong showing that the plaintiff was meeting his employer's reasonable expectations at the time of termination may create a fact issue as to pretext when the employer claims that the employee was terminated for poor or declining performance.

Ridout v. JBS USA, LLC, 715 F.3d 1079, 1083-84 (8th Cir. 2013).

Prior to the plaintiff's termination on April 3, 2018, Mr. Louthian was having communications with people outside of DF&A about Ms. Smith's departure. In an email dated November 14, 2017, Monie Johnson, Executive Director for the Arkansas Coalition Against Sexual Assault, is telling Mr. Louthian that "a little birdie told me Doris is leaving. T/F?" (**See Plaintiff's Exhibit "N"**) (**Louthian's depo., p. 62**). Rather than writing back stating if it was true or false, Mr. Louthian writes back to Ms. Johnson saying "call me – 682-1515." Mr. Louthian also told Doris on November 16, 2017 that he wanted her to start taking Autumn to the state legislature to give her exposure to answering questions from the members of the legislature. (**See Plaintiff's Exhibit "O"**). Mr. Louthian's justification for this directive was "just in the event that you are not here, you move to another job . . . ." (**Louthian's depo., p. 66**). A reasonable juror could reach the conclusion that Mr. Louthian was already in the process of getting rid of Doris Smith as early as November 2017.

The plaintiff has been employed with the DF&A since 2004.  Ms. Smith started out in the entry level and worked her way up.  When Ms. Smith was first employed by DF&A, she faced discrimination right at the door.  Upon her initial hire with DF&A, Ms. Smith was placed in a lowly hourly position, despite the fact that she was a certified public accountant, i.e., a professional.  Although she thought that this was strange, she accepted the position and worked her way up.  Ms. Smith worked hard, and became an administrator.  The mistake that Ms. Smith made was having the audacity to want equal treatment.  When she stood up against racial discrimination, she was terminated.  If this goes unchecked, then Title VII would be rendered mealiness.  Ms. Smith's livelihood has been stripped from her, all because she dared to request equal treatment under the law.

> The Court has recognized that in enacting the 1866 Act, Congress took aim at discrimination in employment, from whatever source.  Discrimination must be eliminated if the 'badges and incidents' of slavery are to be fully eradicated, particularly within the context of employment:
>> Racial discrimination in all areas, and particularly in the areas of education and employment, is a devastating and reprehensible policy that must be vigilantly pursued and eliminated from our society:
>>> Racial discrimination can be the most virulent of strains that infect a society and the illness in any society so affected can be quantified.  Exposure to embarrassment, humiliation, and the denial of basic respect can and do cause psychological trauma to its victims.  The disease must be recognized and vigorously eliminated wherever it occurs.  But racial discrimination takes its most malevolent form when it occurs in employment, for prejudice here not only has an immediate economic effect, it has a fulminating integrant that perpetuates the pestilences of degraded housing, unsatisfactory neighborhood amenities, and unequal education.

<u>Edwards v. Jewish Hospital of St. Louis</u>, 855 F.2d 1345, 1349 (8th Cir. 1988), *quoting*, <u>General</u>

<u>Building Contractors Ass'n v. Pennsylvania</u>, 458 U.S. 375, 413, 102 S.Ct. 3141, 3161-62, 73

L.Ed.2d 835 (1982)

Conclusion

The plaintiff has presented sufficient evidence that demonstrates that she was the victim of disparate treatment on account of her race, when she was denied the opportunity to be placed on the SE02 pay grade, like her white contemporaries were. Also, the plaintiff has presented sufficient evidence that demonstrates that after she complained about discrimination, she was the victim of retaliation, when she was ultimately terminated from her place of employment. Therefore, the court should deny the defendant's motion for summary judgment.

Respectfully submitted,

Austin Porter Jr.
Bar Number 86145
PORTER LAW FIRM
The Tower Building
323 Center Street, Suite 1035
Little Rock, Arkansas 72201
Telephone: 501-244-8200
Facsimile: 501-372-5567
E-mail: Aporte5640@aol.com

**<u>CERTIFICATE OF SERVICE</u>**

I, Austin Porter Jr., do hereby certify that a copy of the foregoing pleading was electronically filed with the Clerk of the United States District Court for the Eastern District of Arkansas, on this 10th day of February 2020, by using the CM/ECF system, which is designed to send notification of such filing to the following person:

Robert T. James
Assistant Attorney General

323 Center Street, Suite 200
Little Rock, Arkansas 72201

[Robert.james@arkansasag.gov](mailto:Robert.james@arkansasag.gov)

Austin Porter Jr.